## Daniel W. Bacon et al. *v.* Mary Kate Bacon.

1. False Imprisonment. *Who liable. Lunatic asylum.*

    All who unite in the procurement of an illegal commitment to the lunatic asylum are liable in an action for false imprisonment.

2. Same. *Code 1892, § 2843.*

    Code 1892, § 2843, providing how persons not adjudged insane may be admitted into the asylum, does not absolve from liability those who, by false and fraudulent certificates, impose upon and mislead the asylum authorities.

3. Same. *Physicians' certificates. Evidence. Statements upon which physicians acted.*

    In a case against physicians for falsely certifying that the plaintiff was insane, whereby she was confined in a madhouse, evidence is admissible of conversations had between the physicians and others, in which plaintiff's supposed mental condition was discussed, before and as preparatory to the making of the certificate, as tending to show good faith, or the want of it.

4. Same. *Nonreversible error.*

    The exclusion, in such case, of evidence competent only on the question of good faith, will not be reversible error if it be apparent, of record, that the trial. throughout proceeded. and the verdict was based on, the theory that the defendants acted in good faith.

5. Same. *Modification of instruction. Good faith not a defense to actual damages.*

    In an action for falsely imprisoning the plaintiff in an asylum, it is not error for the trial court to modify a defendant's instruction on the issue of malice to the effect that the jury should, if the evidence fails to satisfy, etc., find for defendants on such issue, by adding thereto that this of itself should not bar the recovery of actual damages if the plaintiff be otherwise entitled thereto.

6. Same. *Mitigation of damages.*

    A defendants' instruction in an action for falsely imprisoning the plaintiff in an asylum, affirming that the jury should fully consider the evidence of defendant's good faith, which does not limit

the effect of such consideration to mitigating damages, may without error, be refused.

7. INSTRUCTIONS. *Practice. Duty of party asking charge.*

It is the duty of the party asking an instruction to see that the judge either grants or refuses the same, and properly indorses his action thereon. If this be not done before verdict, error cannot be predicated of an instruction as if it were refused.

8. SAME. *Already given substantially.*

The trial court may, without error, refuse an instruction, in itself correct, where the charge has already been substantially given.

9. NEW TRIAL. *Excessive damages.*

A new trial will not be granted defendants against whom one thousand five hundred dollars have been awarded, even though they acted in good faith, for wrongfully imprisoning the plaintiff, a sad, silent and fragile lady, past middle life. in a madhouse for three months as a lunatic of the most repulsive character, on the ground that the damages, as compensatory, are excessive.

FROM the circuit court, second district, of Carroll county.
HON. WM. F. STEVENS, Judge.

Mary Kate Bacon, the appellee, was the plaintiff in the court below; the appellants were defendants there. The suit was for false imprisonment, in the detention of appellee, a maiden lady of about fifty years of age, in the state asylum for the insane, brought by her against her two brothers, two physicians and two other parties. She charges the defendants with malice and intent to injure her good name; that they knew she was not insane; that she was carried, against her will, to the asylum and confined there for three months, and then released with a certificate that she was not insane. The defendants pleaded the general issue, and introduced evidence to show that plaintiff was a kleptomaniac; that she believed her kindred were her enemies; that she was moody and acted strangely; that her disposition had changed and she had become suspicious and inclined to make mischief. Plaintiff denied everything tes-

tified to against her, and explained the presence or denied all knowledge of articles charged to have been stolen by her.

Plaintiff was admitted to the asylum under § 2843, code of 1892, which is as follows:

"2843 (661). *How persons not adjudged insane admitted to asylums.*—On application made on behalf of any lunatic or insane person, who is a resident of this state, for his admission into the asylum, the superintendent and trustees may, if they deem it proper, admit him to the asylum, although he had never been adjudged a lunatic; and, if the person be in fact insane or a lunatic, they shall have authority to detain him; but, in all such cases, they shall act at their peril if the person be sane. Before such lunatic or insane person shall be admitted to the asylum, the person making the application shall present to the superintendent a sworn certificate from two licensed, practicing physicians, and one respectable citizen who is personally acquainted with such lunatic or insane person, all of whom shall be residents of the same county in which said lunatic or insane person resides. Upon receipt of such application and certificate, the superintendent shall forward to the physicians blank forms to be filled out and signed by them, giving the history of the patient, form of insanity, and such other information as may be required."

Instruction No. 8, given for defendant, is as follows: "If the jury believe that the plaintiff was suffering from moral insanity, and was a kleptomaniac at the time she was sent to the asylum, they should find for defendants."

No. 23, not marked either as given or refused, reads: "If the jury believe the plaintiff was a kleptomaniac, and that kleptomania is a variety of insanity that renders one afflicted by it a proper person to be admitted into the asylum for treatment, then you should find for defendants."

There was a verdict and judgment for $1,500 in favor of plaintiff, from which defendants appealed to the supreme court.

*Hill & Sisson*, for appellants.

One thousand five hundred dollars is clearly excessive as mere compensatory damages, and ground for reversal, especially as the jury were informed that "good faith and honest purpose" were no protection against damages. Under the evidence, and even the law as announced to the jury, appellants were entitled to a verdict. The proof was overwhelming that Miss Bacon was a kleptomaniac; that she was under a delusion as to her kindred; that her manner had become very peculiar, etc. Dr. Mitchell, appellee's expert witness, unhesitatingly pronounced kleptomania a moral insanity, and stated that a kleptomaniac was a proper subject to be confined in the asylum. He further stated that, if the facts set forth in the physician's certificate were true, Miss Bacon was a proper subject to be confined. All of these facts were proved true "beyond a reasonable doubt and to a moral certainty," it seems to us, and the verdict of the jury was wrong. While it is true that Dr. Mitchell, superintendent of the asylum, released Miss Bacon and certified that she was sane, he also stated in his evidence that kleptomaniacs were cunning and could hide their acts for a long time, and it is just possible that Miss Bacon could and did capture some of the articles belonging to the asylum during her stay there and Dr. Mitchell not know it. We desire to especially contend that the appellants are not liable for the three months' confinement in the asylum. Section 2843 of annotated code only intends and provides that a person suspected of being insane can be carried to the asylum for examination by the superintendent and trustees, and after such examination can either be admitted or discharged. The certificate only carries one to the door of the asylum, and accomplishes its full purpose when that is done. Under the law the superintendent and trustees must then decide whether "the person be in fact insane or a lunatic," and, if they so decide, "they shall have authority to detain him, but, in all cases, they shall act at their peril if the person be sane." The

"peril" applies to the officers of the asylum, and the three months' detention was not caused, and could not be caused, by the appellants. They could only cause an examination to be made by the highest authority in our state on insanity, and their liability ceased when the examination was made. Yet, in this case, the defendants were tried and punished for the three months' detention in the asylum, and evidence was introduced on the subject and it became part of the case, and a material part of it, and no doubt the defendants were punished by the jury for this very confinement.

Drs. Fullilove and Armstrong were not liable under the proof, for while the declaration charged that the certificate was "false and malicious" and "each one acted his part," and that all was done in furtherance of the "common design," yet the evidence fully exonerates the physicians, and the law is that such certificates cannot cause imprisonment or detention, and subsequent detention after the giving of such certificate cannot be said to be predicated of or based on it.. The physicians possess no judicial power and their decision is no adjudication, and the effort to establish that it was the cause of imprisonment wholly fails. 7 Am. & Eng. Enc. L., 667 and note 2. Under the evidence this cause must be reversed as to the physicians, for there can be no cause of action against them.


*McClurg & Flowers*, on same side.

The primary inquiry is, whether the relations and friends and the nonexpert physicians, acting in perfect good faith and solely and sincerely for the good of the patient, have been negligent in discharging the duties to her which they have assumed. If they exercise ordinary care and are not guilty of culpable negligence in preparing the certificate, they are not liable, even though, in point of fact, the certificate be untrue.

The patient's real misfortune is in the existence of a moral and physical condition that seriously arouses the suspicions of

those who love her as to the integrity of her mind and of a state of health that requires special scientific treatment, not in the fact that the misguided love has caused her humiliation, as she claims.

In defense to a declaration like that in this case, charging a common conspiracy to defraud and maliciously injure, negligently, recklessly and intentionally, it is proper that the physicians so charged may prove conversations had with members of the family in care of the patient, at that particular time and with special reference to that particular subject, as original evidence of the information upon which they acted. And so those members of the family are entitled to have those particular conversations go to the jury as original evidence to show how far they acted upon the advice of their family physicians. Both family and physician are entitled to have such conversations go to the jury as parts of the *res gestæ*, and for this reason, if for no other, the other defendants are entitled to have those conversations go to the jury. It is proper evidence independently of being *res gestæ*.

Such are the controlling principles governing this case, as we understand the law, and not the cold, single legal proposition of sanity or insanity as ruled by the court.

There are two proceedings under our statute for obtaining admission into the asylum—one by writ of lunacy and the other upon sworn certificate. The proceeding by writ of lunacy may be instituted by any relative or friend at any time; but strangers cannot institute it until it is shown that the relatives and friends have either neglected or refused to sue out the writ, and, further, that they permit the lunatic or insane person to go at large. The proceeding by writ of lunacy, by whomsoever instituted, is begun by oaths of the prosecutor and notice to the person charged to contest.

The other proceeding to obtain admission, and the one that directly bears upon the case, provides a different mode of procedure, but one culminating in the same inevitable conclusion,

viz.: That the final and responsible adjudication of insanity is lodged with those into whose judgment, skill, and ability the law rests that important question—namely, the superintendent and board of trustees of the asylum. Confessedly, the weak point in the proceeding by certificate lies in the want of notice to the patient. Yet the other and further safeguards thrown about this proceeding make it infinitely more secure against mistakes than the proceeding by writ *de lunatico inquirendo.*

By this humane proceeding the law presumes the person not insane; the effect of the proceeding is not to adjudge the party insane; the caption of the section (2843) is, "*How persons not adjudged insane admitted to the asylums.*" The purpose of the statute is manifestly to provide a means for citizens of the state to have unfortunate members of their families, or their friends, quietly adjudged insane, without imposing upon the agents of the state in this behalf, the final adjudication being with the superintendent and board of trustees. By the other proceeding the superintendent may act alone, but in the proceeding by certificate the superintendent and trustees are constituted the court of last resort.

It certainly follows that when the court ruled that it was incumbent upon the defendants to show that the plaintiff was actually insane at the time she was admitted to the asylum, it made an erroneous construction of the law. Our statute does not require this, but, on the contrary, by its plain, unmistakable language, that question is left to the determination of the asylum authorities; after exercising their discretion as to whether it is a proper case for admission—in doing which they have looked to the evidence before them, viz., the sworn certificate— they admit the patient, not as one already under condemnation, but for further judgment, for the accuracy of which a heavy penalty hangs over them.

The statute under which the defendants acted does not require actual insanity to exist before admission into the asylum. This being true, they are not required to prove that, as a matter of

fact, it did exist at the time she was committed. If they had an honest belief in her insanity, founded upon reasonable grounds, and were prompted by entire good faith to the plaintiff, acting for her good, then there was a full compliance with the statute. If, in point of truth, they were mistaken, they have done nothing more than the law allows them to do, and are not to be mulcted in damages. There is no complaint of injury, except the confinement in the asylum, as to which defendants were powerless. They tendered her to the asylum authorities, with a statement of facts, and acted upon the judgment of the asylum officers.

The statute fixes responsibility upon the superintendent and trustees pointedly. They act at their peril in passing judgment. They are a corporation, with certain defined powers, and held to the performance of certain duties. See § 2807, code 1892, *et seq.* If they admit and hold one who is sane, as is claimed for the plaintiff, they alone are liable. Ordinarily, of course, that liability would not exempt others, but in this case, the defendant being absolutely free from malice, hatred, or ill will, or corrupt motive, and acting positively for the good of the plaintiff, under the humane theory of our laws for caring for the afflicted, she has an action, if she has any at all, against those only who detained her.

We fully recognize the proposition that the physician has a delicate duty to perform when called upon to certify to a state of facts so material, affecting personal liberty, and that he should be cautious, but we contend that, when he has exercised ordinary care, as measured by the particular circumstances of the case in hand, and especially so when he acts free of malice or evil design, and conscientiously for the patient's good. Professor Odronaux says that the certificate of lunacy is a grant of power of a very responsible character, and that the physician takes that power, like all other legal franchises, *cum onere*, and declares that an action will lie against him for maliciously, and without any reasonable or probable cause, sign-

ing a certificate that a party is insane and in a state requiring confinement, in consequence of which a party is detained in custody as a lunatic. He cites Sandford on Lunatics (2d ed.), 518. Therefore, it will seem, if there was a reasonable or probable cause, and no malice, an action would not lie. He also cites *Perkins* v. *Mitchell*, 31 Barb., 461, in support of the doctrine exempting the physician from liability for furnishing evidence under subpœna, or voluntarily, that another is insane. He also cites *Hall* v. *Semple*, 3 F. & F., 337, as authority for the position that, where the physician has done nothing more than sign the certificate, he is not liable in trespass. Nor, if he has merely consulted with another physician, who has signed another certificate and told him his own idea about the case, as Dr. Fullilove did Dr. Armstrong in this one, he is not liable for causing the other to sign such certificate. "But," says the author, "if he signs such a certificate without taking due care and making due inquiries, he is liable for the consequences which ensue." And if, on his own personal examination, he is not satisfied, he is bound to make due inquiries. Nor is he the less liable, for the want of such due care and inquiries, because he has acted *bona fide*. This proposition, too, is based upon a statute requiring a personal examination.

The court will bear in mind that these rules were laid down in disposing of cases arising under statutes much stricter than ours, and that, even under those statutes, good faith, probable cause, and reasonable cause, the duty to inquire, and the question of due care, were all considered, and that, in the trial of the case at bar, each and every consideration of these questions were ruled out by the court in its rulings upon the evidence and in its instructions to the jury. The rulings of the trial court applied with greater rigor to the other defendants, because, by them, they were held to the same strict accountability as the physicians. It is impossible to believe that any law required a near relation—a brother—acting in good faith, for his sister's good, to show absolute insanity, or suffer the pen-

alties of a demon.   Odronaux Jud. Aspects Ins. (N. J., 1878),
59-61, 219, 229; *Hall* v. *Semple*, Taylor's Med. Jur., 758
(Reese).

It is laid down by the highest authorities that a klepto-
maniac is one who acts exactly like the plaintiff is abundantly
shown to have acted, and that such person is insane and a
proper subject to be admitted into a lunatic asylum, even if
there were no other manifestations of this disease.   Taylor,
Browne, Odronaux, and Wharton & Stille all concur in the
opinion that the suspicions, hatred, and general conduct of the
plaintiff, as clearly disclosed by the preponderance of the testi-
mony, are the strongest symptoms of insanity.

*Dodd & Armistead*, for appellee.

The certificate of Fullilove and Armstrong, physicians, and
J. A. Bacon, is grossly false.   These parties, when put
on the witness stand and questioned as to the facts indi-
cating insanity, named in the certificate they had signed
and sworn to, fail utterly to give any facts within their
knowledge upon which to base said statements.   The want
of compliance with the strict letter of the statute, where
"they act at their peril" (code 1892, § 2843), made the
appellee's commitment unlawful and entitles her to a recov-
ery.   "Personally acquainted," as used in § 2843 code
1892, evidently does not mean that a physician can give such
certificate for the commitment of any person whom the physi-
cian may know when the party is pointed out to him, but
it means that the physician shall be "personally acquainted"
with the symptoms of insanity in the particular patient, and
this can be done only by a personal examination of such pa-
tient, which the law requires.   He cannot rely wholly on what
is told him by relatives, as such information is only intended
to guide his judgment, but he must act for himself on his own
examination of the patient.   Taylor's Med. Jur., 11 Am. Ed.,
1892, on pages 696, 697, and 700.   "Physicians who falsely

pretend to have held an inquest as to plaintiff's lunacy, and in their certificate falsely stated plaintiff's physical condition, in consequence of which plaintiff was committed to, and confined in the state hospital, are liable for false imprisonment." *Hurlehy* v. *Martine*, 31 N. Y. (S. R.), 471.

All persons who directly procure, aid, or assist in an unlawful imprisonment are liable as principals, and it is not necessary to prove a conspiracy in order to recover. *Johnson* v. *Bouton*, 53 N. W., 995; 35 Neb., 898.

Argued orally by *Edward Mayes* and *Monroe McClurg*, for appellants.

WOODS, C. J., delivered the opinion of the court.

The capital error of the learned counsel for the defendant physicians is based upon the fact that these physicians had no power to make, and in truth did not make, any adjudication of the plaintiff's insanity; that the certificate signed by and sworn to by them was an expression of opinion merely on their part, and that its sole office had been performed when it carried the plaintiff to the door of the asylum, and that the responsibility for her admission to and detention in that institution is fixed by the statute exclusively upon its superintendent and trustees. While the superintendent and trustees are by, law, made to act at their peril in receiving into and detaining therein one who has not been adjudged a lunatic by regular inquisition, sure it was never thereby intended to absolve from liability those who, by false and fraudulent certificates, have imposed upon and misled the asylum authorities, and thereby unlawfully procured the commitment to the asylum of one not insane. The true view is that all who united in procurement of the illegal commitment are equally liable in an action for false imprisonment.

Whether the correct interpretation of our statute touching the commitment to the asylum of persons not adjudged insane

by inquisition is that the two certifying physicians must make an examination of the supposed lunatic before certifying the fact of insanity may not be free from doubt (though we incline to the belief that such examination is necessary), yet in this case that question is not necessarily to be determined.

In the case before us both physicians did certify, in the paper made by them, and which was required by the superintendent and trustees of the asylum to be made as an indispensable condition precedent to the commitment of the plaintiff, that they had examined her, and found her to be insane and a fit subject for treatment in the asylum, when, in truth, as both physicians frankly testify on the trial, they, nor neither of them, had examined her as to her sanity or insanity. They are bound to have seen and known, from the blank form of certificate sent them by the superintendent for their use in this case, that before the plaintiff would be received into the asylum they must certify that they had examined her, and found her insane and a fit subject for treatment in the asylum. They are chargeable, too, with knowledge of our statute on this subject, which declares that " the board of trustees shall prescribe suitable regulations as to the history of each case admitted without adjudication, and may compel conformity to such rules by refusing the application." And yet, with knowledge of this statute, and of the construction placed upon it by the trustees, as clearly shown by the form of certificate sent them for use in this case, they certified, as required by the rules and regulations adopted by the asylum authorities, that they had examined the plaintiff, when, in truth, they had not examined her.

It is true that both physicians had observed the plaintiff in a casual way and not professionally. One of the physicians had observed the plaintiff on a single occasion when she was, for a few moments, awaiting the services of an attendant in a shoe store. He saw her with a vacant stare gazing out into the street. The other physician had other and greater opportunities for observation, with the result of noticing her

sad and silent and inattentive to what was transpiring around her, and, on one occasion, sitting with her hands folded on her lap, facing the wall of the hallway, and refusing to be drawn into any conversation, or to reply at all to a remark made to her. But this was not the examination required to be made as a condition precedent to a commitment to the asylum.

The first eight assignments of error call in question the correctness of the action of the trial court in refusing to permit witnesses to give in detail the particulars of conversations had between the two physicians and others in which plaintiff's supposed condition as to lunacy was disclosed to the physicians before and as preparatory to their making their certificate.

We agree with counsel for appellants that this action of the court was erroneous. This evidence was original and material and was competent to show whether the physicians acted in good faith, and if they did, the evidence would go in mitigation of damages. The authorities seem to be clear on this point. But we cannot reverse for this error, for the reason that the witnesses were all permitted to state that the condition of the plaintiff was fully made known to the physicians, and the particulars of this condition were most elaborately put before the jury by many, many witnesses. So the jury had before it all the information which could have been communicated to the physicians, and the amount of the verdict is strongly suggestive of the fact that the jury believed that the physicians, and all the other defendants, acted throughout in perfect good faith, and not from malicious or other improper motives. All the evidence in the record leads us to the same conclusion.

The action of the trial court in overruling the motion of defendants below to exclude the evidence of Dr. Sanderson is assigned for error. The witness testified that, in his opinion, no physician could determine whether a person was insane without personal examination. This evidence seems irrelevant and immaterial, for the issue was not whether insanity could be determined without personal examination, but whether plaintiff

had been unlawfully committed to the asylum on false certificates, when, in fact, she was not insane. The error, if it was error, was harmless.

We come now to examine the errors assigned to the court's action in giving, refusing, and modifying instructions.

In the third instruction asked for defendant, the jury was informed "that the burden of proof is upon the plaintiff to satisfy your minds by a preponderance of the evidence that the defendants wrongfully conspired and colluded with each other to have the plaintiff incarcerated in the lunatic asylum, unlawfully and against her will, each defendant acting his part maliciously, wantonly, and out of a spirit of reckless disregard for the rights and liberties of the plaintiff, and with intent to injure the plaintiff in her reputation and character and standing before the people, and that she was in fact thereby damaged, and that, if the evidence fails to so satisfy your minds, you should find for the defendants upon this allegation in the declaration," the court adding, "but that should not of itself bar recovery for actual damages, if the jury should believe from the evidence that the plaintiff is entitled to recover actual damages." The action of the court was eminently proper. It simply made clear to the mind of the jury, by positive statement, what would have been left otherwise to deduction or inference on the part of the jury. The charge is absolutely correct, as modified, or added to, by the court.

The twentieth instruction, refused, for defendant, constitutes no reversible error. This instruction informed the jury that the good faith, or want of good faith, of defendants, as shown by the evidence, should be fully considered by the jury. The jury had this charge substantially given in the seventh charge for defendants. Besides, the charge is incomplete and might have misled the jury if it had been given as asked. For what purpose the jury was to consider the evidence as to good faith or bad faith the jury was not advised. The jury might have conjectured that evidence of good faith afforded a full defense

to all demands, and might not have regarded such evidence as going only to mitigation of damages.

The refusal of the court to mark the defendant's twenty-third instruction either given or refused, after trial and verdict, and upon motion for new trial, was not error. The court was then without power to pass upon instructions. The bill of exceptions shows that neither the court nor the counsel had noticed the failure to act upon said instruction until the argument upon the motion was proceeding, all agreeing that the failure was the result of oversight. It is the duty of counsel to present to the court for its action all instructions desired and to see to it that the court does act.

. But no hurt came to the defendants by reason of this oversight in failing to mark defendant's twenty-third instruction given or refused, because the same principle was clearly announced to the jury in defendant's eighth charge. Indeed, the eighth charge states the principle more clearly and strongly than the overlooked twenty-third instruction. As to all other assignments of error in the court's action in dealing with instructions, it is sufficient to say that such assignments are not maintainable.

Finally, we are asked to set aside and reverse the judgment of the court below, because, as is alleged, the verdict is unwarranted by the evidence and is excessive.

We cannot confidently affirm that the verdict is not warranted by the evidence. The jury has found that the plaintiff was not insane, and was not the victim of that most horrible mania alleged against her in the certificate on which she was committed to the asylum, and we cannot say the jury was clearly wrong. The amount of the verdict, even as compensatory damages, cannot be said to shock reason or conscience. A sad, silent, and fragile little lady, now beyond middle life, wrongfully declared a lunatic, and that of the most repulsive style, shut up in a madhouse, under the circumstances disclosed, and with a stigma branded upon her name and charac-

ter which verdicts of juries and judgments of courts may never wholly efface, and with endurance of such shame, humiliation, and crucifixion of soul as happily does not often fall to woman's lot, has appealed to the courts for redress of her wrongs, and we do not feel authorized to take from her the poor fruits of her victory.

*Affirmed.*