John R. CZAP, Jr., Plaintiff-Appellant,

v.

James A. MARSHALL, William P. Schmitt, Harold Alfred Bastrup, Richard Roe and The Ohio Casualty Insurance Company, a corporation, Defendants-Appellees.

No. 13799.

United States Court of Appeals
Seventh Circuit.

Feb. 21, 1963.

Rehearing Denied May 8, 1963.

Cleland P. Fisher, Janesville, Wis., for appellant.

Leo E. Vaudreuil, Vaudreuil & Vaudreuil, Kenosha, Wis., for appellees.

Before HASTINGS, Chief Judge, and CASTLE and MAJOR, Circuit Judges.

MAJOR, Circuit Judge.

This action was commenced March 11, 1957, by plaintiff, John Czap, Jr., to recover damages against defendants, James A. Marshall and William P. Schmitt. On January 24, 1961, an amended complaint was filed by which Harold Alfred Bastrup and The Ohio Casualty Insurance Company, a corporation, were added as defendants.

The action in the main is based upon the contention that plaintiff was falsely arrested, imprisoned and confined in jail for an unreasonable time without being taken before a magistrate, with the opportunity afforded to give bond. He also claims that his civil rights as guaranteed by the laws and Constitution of the United States were violated.

The occurrence and incidents giving rise to the action took place on Sunday, March 13, 1955, at a farm located in Kenosha County, Wisconsin, owned and operated by plaintiff's parents, Mr. and Mrs. John Czap, Sr. A public sale previously advertised was to take place on that day. Plaintiff drove from his home in Chicago and appeared at the Czap home shortly before the time fixed for commencement of the sale. At that time there were assembled several persons, including an auctioneer, plaintiff's parents, two sisters and perhaps other relatives. Sometime after noon Bastrup and Schreck, both deputy sheriffs, arrived in a squad car. They talked to numerous persons, including members of the Czap family. Subsequently, they arrested plaintiff and took him in a squad car to the Kenosha County jail, where he was committed and retained until his release

the next morning by order of the district attorney. The officers had no warrant for plaintiff at the time of his arrest and none was subsequently issued.

At the conclusion of plaintiff's case, which was tried to a jury, the Court denied defendants' motion for a directed verdict. However, at the conclusion of the trial, the Court allowed a similar motion, directed a verdict for the defendants and entered judgment accordingly. From this judgment the appeal comes to this Court.

It is appropriate to note in the beginning that neither of the two arresting officers, Bastrup and Schreck, was a party to the action at the time of the trial. Bastrup long before he was named as a defendant had become a resident of the State of California. Following a pre-trial conference, the Court, on April 18, 1961, entered an order of dismissal as to him on the ground that the Court, for lack of service, was without jurisdiction. The order recites that the parties agreed to such dismissal. Schreck, the other arresting officer, was deceased and not named as a defendant.

Plaintiff's appeal from the judgment of dismissal as to Bastrup is clearly without merit. The trial Court had no jurisdiction as to him and neither does this Court.

Defendant Marshall at the time of the occurrence was county sheriff. It is contended that he was liable and responsible for the acts of the arresting officers and that he was derelict in his duties as sheriff in failing to have plaintiff taken before a magistrate within a reasonable time. As to defendant Schmitt, a deputy sheriff, it is contended that he was liable because of certain activities in connection with plaintiff's commitment. As to defendant The Ohio Casualty Insurance Company, it is contended that it as the surety on the bond of Schmitt and Bastrup was liable for their alleged unlawful activities.

We have read the entire record, including the exhibits and the testimony heard at the trial, and are convinced that

the correct result was reached by the District Court. The only question of any consequence is whether that result should have been reached in the form of a directed verdict. In considering this issue, we must keep in mind, of course, the rule that a question for the jury is presented if there is substantial evidence supporting plaintiff's claim when viewed in the light most favorable to him.

■ Turning first to the circumstances in connection with plaintiff's arrest, the record presents a rather unusual situation. Plaintiff testified in support of his case, and his testimony standing alone, if believed, would have presented a submissible issue. However, plaintiff had taken the deposition of Bastrup in California (not as an adverse party), and introduced such portions of the deposition as were thought favorable to him. Thereupon, defendant offered and the Court admitted, over the objection of plaintiff, the remainder of the deposition. No question is raised here as to the propriety of the Court's ruling in this respect.

We shall attempt to summarize in brief form the testimony of plaintiff and Bastrup as to the circumstances connected with plaintiff's arrest. In connection with plaintiff's version, it is relevant to note some background. Previous to his arrest, plaintiff had been engaged in a controversy with his family regarding his claim to certain property in possession and control of his parents. In fact, a case relative thereto was pending in a State Court. At one hearing in connection therewith, plaintiff in the presence of the Court had threatened to kill his mother. Plaintiff learned of the auction sale, advertised by his parents to be held March 13, 1955. On the previous day, he procured from a State Court Judge an order directed at his parents to show cause why they should not be enjoined from selling, transferring or otherwise disposing of their property, except the order permitted the conduct of the sale as advertised but restrained the parents from disposing of the proceeds until further order of the Court. It appears that a copy of this order was served on his parents the day prior to the sale. (As far as the record discloses, the arresting officers previous to the day in question had no knowledge of this family controversy.)

As noted, plaintiff arrived at the farm shortly before the time the sale was to commence. Later, the arresting officers while cruising near the Czap farm received from the sheriff's office a radio report, "We are having trouble with Mr. Czap's son, would like to have squad car stop at the place." This was a telephone request made by the auctioneer at the Czap farm. In response thereto, the officers arrived at the farm sometime shortly after noon.

Plaintiff testified that he was in the yard when the officers arrived, and that immediately after learning his identity they took him in custody and forced him into the squad car. He emphatically denied that he had committed any offense, done any harm, threatened any person, or used any vulgar or profane language. In short, according to his testimony, he was as innocent and docile as any person could be.

Officer Bastrup testified that upon their arrival at the farm there was a large crowd of men, women and children in the yard and that he went into the house where plaintiff, his mother and sisters were engaged in an argument. He was told that plaintiff had come to the farm for the purpose of stopping the auction, that he had beat his sister and that she wished to file a complaint against him. This statement was corroborated by the auctioneer. At that time Bastrup observed that the sister had bruises on her face and blood flowing from visible marks. Plaintiff left the house, and so did Bastrup.

The two officers talked to plaintiff in the yard concerning the family controversy, asked him not to create any further disturbance and to leave the property, as requested by his mother and sister. This he refused to do. Plaintiff produced certain identification cards and advised the officers that they did not

know what they were doing. Plaintiff used much profanity and vulgar language in the presence of the crowd in the yard. His sister again told the officers that she wanted to sign a complaint and charge plaintiff with assault and battery. They told her that in order to do so she would have to go to the district attorney's office the following day.

Thereupon, the officers took plaintiff to the Kenosha County jail. Bastrup made out what is called an arrest sheet which, among other things, stated that plaintiff entered his mother's home and assaulted her and his sister, and "Arrested on complaint of mother and sisters who will come into the DA office and sign complaint. Relatives claim they are afraid of this man and he frequently carries a gun." The arresting officers had no further connection with the matter. Plaintiff was turned over to other officers and, after the performance of certain routine matters including the taking of his fingerprints and taking from his person certain so-called identification cards, he was committed to jail.

The District Judge, in connection with the dismissal of plaintiff's action, rendered an opinion in which he made no finding as to whether plaintiff's arrest was legal or illegal. Plaintiff here, however, devotes much of his argument in support of his contention that it was illegal and that all persons who participated in or were connected with his commitment and detention were responsible. In our view, it is not open to serious doubt but that the arresting officers were justified in making the arrest on the grounds that a disturbance of the peace had been committed by plaintiff in their presence and that they had good reason to believe that he had committed a felony by assaulting his sister. For them to have left the premises without arresting him would have been a clear dereliction of duty. Plaintiff's testimony is so patently untrue that it would not support a finding in his favor whether made by a jury or a court. We hold that his arrest was lawful, and it follows that his commitment

to the county jail as a result of such arrest was also lawful.

As to defendant Marshall, plaintiff contends that under the common law of the State of Wisconsin a sheriff is responsible for the acts of his deputies. Even so, if plaintiff's arrest was lawful, as we have held, there would be no liability on the part of the sheriff. However, assuming for the moment that the arrest was unlawful, still there would be no liability on his part because the common law of Wisconsin has been superseded by a statutory provision which fixes the responsibility of a sheriff for the acts of his deputies. Section 59.22(4) of the Wisconsin Statute, fixing the liabilities of a sheriff, provides:

> " * * * the sheriff shall not be financially responsible for the acts, defaults or misconduct in office of either his jailer or his deputies * * * except where such deputy or jailer acts under the express direction of the sheriff."

There is not the slightest basis for a contention that the deputy sheriffs in arresting plaintiff acted "under the express direction of the sheriff."

Without going into details, it is sufficient to point out that the provision lastly quoted is a part of a broad Act relative to the duties, rights and obligations of a sheriff. Deputy sheriffs in a County such as Kenosha are Civil Service employees. They are not appointed by the sheriff and neither can they be discharged by him. While he is in office, if a vacancy occurs, the appointment must be made from an eligible list compiled by the Civil Service Commission. He can get rid of a deputy only by preferring with the Commission charges of misconduct and proof of the same. The situation is illustrated in the instant case where the arresting officers, Bastrup and Schreck, were deputy sheriffs both before and subsequent to Marshall's tenure as sheriff. He had nothing to do with the appointment of either. The legislature having imposed such restrictions upon the rights

and privileges of a sheriff in relation to his deputies, it seems only reasonable that it should at the same time reduce his obligations and liabilities in respect thereto.

Marshall had nothing to do with the arrest; in fact, he did not know it had taken place until about 10 a. m. the following morning (Monday) when he learned from the arrest sheet (above referred to) that plaintiff was in jail and the reason for his arrest.

■ Defendant Schmitt, another deputy sheriff, also had nothing to do with plaintiff's arrest. It was only after plaintiff was taken to jail that Schmitt entered the case. Plaintiff testified that Schmitt was one of the persons who had charge of him until he was placed in jail —in fact, that Schmitt was the person who placed him in jail and locked him in a cell. Schmitt testified that he was not at the sheriff's office or the jail at any time on Sunday, the day of the arrest, but that he spent the day at his sister's home at Oak Park, Illinois. The trial Judge stated that he believed the testimony of Schmitt in this regard. Assuming, however, that Schmitt placed plaintiff in jail and locked him in a cell, there would be no liability on his part from that act alone after plaintiff had been brought to the jail as the result of a lawful arrest.

■ Plaintiff also argues that Marshall and Schmitt were responsible for and therefore liable because of the unreasonable delay in taking him before a magistrate where he could be informed of the charges against him, with the opportunity to give bond. The rule in Wisconsin in this respect appears to be no different from that followed in courts generally, both State and Federal. For instance, in Schoette v. Drake, 139 Wis. 18, 120 N.W. 393, it is held that it is the duty of the arresting officer to take the prisoner before a magistrate for bail without unreasonable delay. This requirement is analogous to that contained in Rule 5(a) of the Federal Rules of Criminal Procedure where it is provided,

"* * * any person making an arrest without a warrant shall take the arrested person without unnecessary delay before the nearest available commissioner * * *." What constitutes unreasonable or unnecessary delay must be determined from the facts and circumstances of each case. Holt v. United States, 8 Cir., 280 F.2d 273, 274; Muldrow v. United States, 9 Cir., 281 F.2d 903, 906 (and cases therein cited and discussed). In Holt, the defendant was arrested on Sunday and not taken before the Commissioner until the following Tuesday; in Muldrow, the defendant was arrested on Friday and not taken before the commissioner until the following Monday. It was held on the facts of each case that the defendant was taken before a commissioner without "unnecessary delay."

■ In the instant case, plaintiff, according to the arrest sheet, arrived at the jail at 2:50 p. m. Sunday and was discharged by the district attorney about noon on the following day, without a complaint being filed against him. The record is not clear as to exactly what happened on that morning. It does reveal that plaintiff's mother and sister promised the arresting officers that they would come to the district attorney's office at that time for the purpose of preferring charges. It also indicates that they appeared but refused, as often happens in family rows, to sign a complaint. In any event, plaintiff was ordered discharged by the district attorney. It is true, as plaintiff points out, that he never was taken before a magistrate, as the law requires. It is not discernible, however, how plaintiff sustained any damages by being taken before the district attorney, who ordered his discharge, rather than before a magistrate, who could have rendered him no more favorable service. Under the circumstances, we hold that plaintiff was not unreasonably detained and that his claim for damages in this respect is without merit.

■ Plaintiff also asserts his rights were violated by Schmitt for failure to return to him promptly certain so-called

identification papers which were taken from his person at the time of his arrest or shortly thereafter. Some of these papers showed that plaintiff was a member of certain police organizations in Chicago. Schmitt called the police department and the sheriff's office in Chicago to inquire about plaintiff. He was informed that plaintiff was neither a policeman nor a deputy sheriff, and they requested that the papers found on plaintiff be sent to them for investigation. Some three months later they were returned to Schmitt, who delivered them to plaintiff or his representative. Plaintiff admitted that he had not had any use for these papers from the time they were taken from him until they were returned and that he had sustained no damages in that respect. He also admitted in effect that the best use he had for the papers was to escape being charged with a speeding violation. Assuming, without deciding, that the taking of these papers from plaintiff and their retention for several weeks was a violation of his rights, according to his own testimony it was a wrong from which he sustained no damages.

This brings us to the defendant, The Ohio Casualty Insurance Company, whose bond by its terms bound the company to pay "to the County of Kenosha, Wisconsin, called the employer, the amount of any loss which any employee named in the schedule may, while in the positions named in the schedule, cause to the employer, not exceeding the amount set opposite the name of such employee." Deputy sheriffs named in the schedule, among others, were Harold Bastrup and Kermit Schreck, the arresting officers, and defendant William P. Schmitt. This bond by its express terms was only for the protection of the County of Kenosha and not of third persons. Plaintiff argued in the court below, as he does here, that the bond in question must be treated as an official bond and must be construed as embodying the provisions of the Wisconsin Statute which require the execution and filing of an official bond for the protection of persons who may sustain damages as the result of a deputy sheriff's misconduct.

We see no reason to pursue further plaintiff's contention in this respect. The issue as to liability on the part of Ohio has become moot. Even though its bond be treated as official and construed to include the provisions of the Wisconsin Statute to protect third persons from the unlawful acts and misconduct of deputy sheriffs, there could be no liability on its part in the instant situation. This is so because we have concluded and so hold that there was no unlawful or wrongful conduct on the part of any official who participated in the arrest, commitment and detention of plaintiff.

In view of what we have decided on the material issues of the case, plaintiff's contention that he was deprived of his civil rights, in violation of the Federal Constitution and Law, must be rejected. Monroe et al. v. Pape et al., 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492, so strongly relied upon, is clearly without application.

The judgment appealed from is

Affirmed.