**Katie Ruth ANDERSON et al., Plaintiffs-Appellants,**

v.

**J. J. NOSSER et al., Defendants-Appellees.**

**James BRADLEY et al., Plaintiffs-Appellants,**

v.

**J. J. NOSSER et al., Defendants-Appellees.**

No. 28971.

United States Court of Appeals, Fifth Circuit.

Feb. 10, 1971.

Rehearing Granted and Rehearing En Banc Granted May 27, 1971.

Bell, Circuit Judge, concurred specially and filed opinion.

---

Lawrence D. Ross, Jackson, Miss., Lawyers' Committee for Civil Rights Under Law, Bernard Jolles, Franklin,

Bennett, Des Brisay & Jolles, Portland, Or., Robert L. Beerman, Morrison, Paul & Bailey, New York City, for plaintiffs-appellants.

A. F. Summer, Atty. Gen., William A. Allain, Asst. Atty. Gen., Jackson, Miss., Edwin E. Benoist, Jr., Joseph S. Zuccaro, Natchez, Miss., Charles A. Marx, Jackson, Miss., for defendants-appellees.

Before TUTTLE, BELL, and GOLDBERG, Circuit Judges.

GOLDBERG, Circuit Judge:

Our locale is Natchez, Mississippi, where the mood in the fall of A.D. 1965 was anything but irenic. Our story concerns the arrest and subsequent detention of participants in racial protest demonstrations. According to the undisputed facts those arrested were subjected to sub-human treatment which beggars justification and taxes credulity. Finding ourselves unable to sustain the verdict of the jury below, we reverse and render judgment as to liability of the defendants and remand for the assessment of damages due the plaintiffs.

### I.

While many peripheral matters in this case are hotly contested, the central and basic facts are largely uncontradicted. Relying solely on stipulations and undisputed testimony, we summarize the sordid details.

On October 2, 3, and 4, 1965, plaintiffs and many others paraded in Natchez to publicize their grievances, particularly discrimination on account of race. At the time a Natchez ordinance prohibited parades without the written permission of the Chief of Police. Natchez, Miss. Parade Ordinance of May 26, 1964, Ordinance Book F, at 395. The ordinance was later found unconstitutional, but at that time it had not been so declared.

Shortly after the march commenced on Saturday morning, October 2, defendant Robinson, Natchez Chief of Police, and defendants Rickard, Cowart and Beach,

Natchez police officers, arrested approximately 700 [1] persons for parading without a permit in violation of the Natchez ordinance. Following the arrests, plaintiffs and others were transported to the Natchez city auditorium. There defendant Flowers, a Natchez police officer, defendant Cameron, Natchez Fire Chief, and firemen acting pursuant to Cameron's directions assisted Chief Robinson and officers Rickard, Cowart, and Beach in detaining plaintiffs. There is some evidence that many of those arrested, particularly minors, were permitted either to post bond or to obtain release on personal recognizance. The evidence, however, also reveals that many of those arrested were either not permitted to make bond or were unable to do so during the time they were incarcerated in Natchez. Furthermore, no effort was made to secure a magistrate, and as a result none of the plaintiffs or other arrestees were brought before a judicial officer for examination. No youth court order was obtained with respect to any of those arrested who were minors.[2]

Late that Saturday night approximately 150 of those held at the auditorium were transported by bus over 200 miles to the Mississippi State Penitentiary at Parchman. Mississippi Highway Safety Patrolmen provided the escort.[3] This initial group of prisoners arrived at the penitentiary early Sunday morning, October 3, and were taken to its maximum security unit upon order of defendant Breazeale, the penitentiary superintendent. Thirty-nine cells had been vacated in the unit, and, following the arrest and transfer of additional protesters on Sunday and Monday, more than 250 prisoners were ultimately housed there.

Prison personnel were directed by Breazeale to process the Natchez protesters under the "standard" treatment accorded prisoners in the maximum security unit. Though there is some dispute as to exactly what this treatment entailed, the undisputed evidence reveals the following.

On arrival all male prisoners were required to strip naked and all women prisoners were ordered to remove their shoes, stockings, sweaters, coats, jewelry, and wigs. All were compelled to consume a laxative and were deprived of all personal belongings, including sanitary napkins and medicines. The prisoners were then led to the cells. Up to eight persons were placed in each cell, which contained two steel bunks without mattresses or other bedding, a toilet without a seat, and a washbasin. There were no towels or soap and there was inadequate toilet paper. The temperature ranged from 60 to 70 degrees, the chill being aggravated by exhaust fans which blew intermittently on the occupants. Some

1. There is some dispute as to the number of protesters who were arrested. Plaintiffs contend that defendants' own records reveal that 520 arrests were made on Saturday, but defendants respond that those records are incomplete in that a number of children were released without being booked. For the purposes of this appeal, we accept defendants' figures as correct.

2. Subject to certain exceptions Mississippi law provides that the youth court "shall have original jurisdiction in all proceedings concerning any delinquent or neglected or battered child residing or being in the county." Miss.Code Ann. § 7185–03. And, "whenever any child thirteen years of age or older is brought before any justice of the peace court or municipal court charged with the commission of a misdemeanor under a state law or municipal ordinance, such court shall, unless prosecution is permitted by order of the youth court, transfer the case to the youth court of the county, to be dealt with as a case of delinquency in accordance with the provisions of this act. * * * " Id. § 7185–16.

3. While there may be some contradictions, we are bound by the evidence which would support a finding that this transfer was undertaken only after Chief Robinson ascertained that both Natchez and surrounding jail facilities were incapable of accommodating the large number of protesters. The evidence also shows, however, that no effort was made to continue processing those arrested so that all those able to do so would at least be able to post bond and obtain release.

of the men eventually were permitted to get their underwear, but others were nude for a period of 36 hours. Many were subjected to blood tests. Moreover, while standing in the prison courtyard awaiting processing several plaintiffs were kicked, pushed, cursed, and abused by the highway patrolmen and other guards.

On Sunday morning, October 3, and Monday evening, October 4, more protest marchers were arrested and detained in Natchez. Nearly 100 were subsequently transported to Parchman and given similar treatment to that accorded the first group of prisoners. Plaintiffs, after individually posting $200 property bonds, were released on Monday, October 4, Tuesday, October 5, and on Wednesday, October 6.

On February 17, 1966, a complaint was filed on behalf of 68 adults and 84 minors, who had been detained in Parchman that October, against Chief of Police Robinson, Police Officers Rickard, Cowart, Beach, and Flowers, Fire Chief Cameron, Superintendent Breazeale, J. J. Nosser, Mayor of Natchez, and T. B. Birdsong, Commissioner of Public Safety. That complaint alleged that plaintiffs were falsely imprisoned and subjected to cruel and unusual punishment, and sought monetary damages under 42 U.S.C.A. § 1983. An identical complaint on behalf of 11 additional persons was filed on October 1, 1966. Amended complaints were filed in each action on December 6 and 9, 1966, alleging false imprisonment and other torts under Mississippi law. The actions were consolidated and eventually ordered to trial in June of 1969, solely on the issue of liability. A jury returned a verdict for defendants, and plaintiffs' subsequent motions for judgment notwithstanding the verdict or alternatively for a new trial

were overruled. Plaintiffs now appeal from the district court's denial of those motions.

## II.

Plaintiffs rely on 42 U.S.C.A. § 1983 and Mississippi tort law joined under the doctrine of pendent jurisdiction to sustain their contention that defendants should be held liable as a matter of law.

■ Since Monroe v. Pape, 1961, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492, it has been clear that section 1983 [4] will sustain a damage action against individuals acting under color of state law for deprivation of federal constitutional rights. *See also* Adickes v. S. H. Kress & Co., 1970, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142. Since all defendants in this case are state or municipal officials, the requisites of section 1983 are satisfied upon a showing of the denial of a constitutional right.

■ Furthermore, the doctrine of pendent jurisdiction permits a consideration of the related state claims. The court below exercised its discretion to join the state claims, an action justified by the Supreme Court's decision in UMW v. Gibbs, 1966, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218:

"Pendent jurisdiction, in the sense of judicial *power*, exists whenever there is a claim 'arising under [the] Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority * * *,' US Const, Art III, § 2, and the relationship between that claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional 'case.' The federal claim must have substance sufficient to confer subject matter jurisdiction on the

4. 42 U.S.C.A. § 1983 provides:
"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

court. Levering & Garrigues Co. v. Morrin, 289 U.S. 103, 53 S.Ct. 549, 77 L.Ed. 1062. The state and federal claims must derive from a common nucleus of operative fact. But if, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues there is *power* in federal courts to hear the whole."

*See also* Whirl v. Kern, 5 Cir. 1969, 407 F.2d 781, cert. denied, 396 U.S. 901, 90 S.Ct. 210, 24 L.Ed.2d 177. The federal claims here are substantial, and both the federal and state counts, grounded upon the incarceration and treatment of plaintiffs, arise out of "a common nucleus of operative fact." Jurisdiction being satisfied, we turn to the merits of the various allegations.

### III.

Plaintiffs' first contention is that as a matter of law the trial court should have granted judgment on their claim that their treatment at Parchman constituted cruel and unusual punishment, unlawful under federal and state law.

█ The cruel and unusual punishment clause of the Eighth Amendment is applicable to the states through the due process clause of the Fourteenth Amendment, Robinson v. California, 1962, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758, and thus a violation of its mandate may constitute a cause of action cognizable in federal court under

section 1983. Wright v. McMann, 2 Cir. 1967, 387 F.2d 519; Jordan v. Fitzharris, N.D.Cal.1966, 257 F.Supp. 674.

█ Defendants' primary defense is that the matter of plaintiffs' treatment at Parchman was one of internal prison discipline, not reviewable by the courts. It is true that the federal courts entertain some reluctance to interfere with a prison's internal discipline. *See* Roy v. Wainwright, 5 Cir. 1969, 418 F.2d 231; Granville v. Hunt, 5 Cir. 1969, 411 F.2d 9, 12; Schack v. Florida, 5 Cir. 1968, 391 F.2d 593, cert. denied, 392 U.S. 916, 88 S.Ct. 2080, 20 L.Ed.2d 1376. This policy is based on the fear that judicial scrutiny of the decisions of prison officials would undermine the authority of those officials and is reinforced by the view that "lawful incarceration may properly operate to deprive the convict of certain rights which would otherwise be his to enjoy," Jackson v. Bishop, 8 Cir. 1968, 404 F.2d 571, 576. However, this chariness does not mean that prison officials have unfettered discretion in the treatment of their prisoners. As then Circuit Judge Blackmun phrased it in Jackson v. Bishop, *supra*, 404 F.2d at 577:[5]

"The federal courts, including this one, entertain a natural reluctance to interfere with a prison's internal discipline. This is true with respect to federal institutions, Glenn v. Ciccone, 370 F.2d 361, 363 (8 Cir. 1966); Sutton v. Settle, 302 F.2d 286, 288 (8 Cir. 1962), cert. denied, 372 U.S. 930, 83 S.Ct. 876, 9 L.Ed.2d 734; Garcia v. Steele, 193 F.2d 276, 278 (8 Cir.

---

5. This court has also sanctioned judicial intervention in compelling cases. Thus, in Jackson v. Godwin, 5 Cir. 1968, 400 F.2d 529, 532–533, we stated:

"Acceptance of the fact that incarceration, because of inherent administrative problems, may necessitate the withdrawal of many rights and privileges does not preclude recognition by the courts of a duty to protect the prisoner from unlawful and onerous treatment of a nature that, of itself, adds punitive measures to those legally meted out by the court."

Similarly, in Schack v. Florida, supra, 391 F.2d at 594, we emphasized:

"On the other hand, there may be cases where the deprivation of medical care will warrant judicial inquiry and action. Cf. Edwards v. Duncan, 4 Cir., 1966, 355 F.2d 993 (federal prisoner); Talley v. Stephens, E.D.Ark., 1965, 247 F.Supp. 683 (state prisoner).

"We have couched the test in terms of an abuse of discretion on the part of federal prison officials. Thompson v. Blackwell, 5 Cir., 1967, 374 F.2d 945."

1951), see Holland v. Ciccone, 386 F. 2d 825 (8 Cir. 1967), cert. denied, 390 U.S. 1045, 88 S.Ct. 1646, 20 L.Ed.2d 307, as well as to state prisons, Douglas v. Sigler, 386 F.2d 684, 688 (8 Cir. 1967); Lee v. Tahash, 352 F.2d 970, 971 (8 Cir. 1965); Wright v. McMann, supra, 387 F.2d at 522.

"However, the courts, including this one, have not hesitated to entertain petitions asserting violations of fundamental rights and, where indicated, to grant relief. In Glenn v. Ciccone, which we have just cited, this court clearly indicated that 'a factual showing of cruel and unusual punishment in violation of the Eighth Amendment' would support interference by a federal court. 370 F.2d at 363. We have made a like statement in many other cases. Carey v. Settle, 351 F.2d 483, 485 (8 Cir. 1965); Haynes v. Harris, 344 F.2d 463, 466 (8 Cir. 1965); Harris v. Settle, 322 F.2d 908, 910 (8 Cir. 1963), cert. denied 377 U.S. 910, 84 S.Ct. 1171, 12 L.Ed.2d 179. Although the Eighth Circuit cases just cited concern a federal institution, the principle, of course, has equal application to a state penitentiary. Wright v. McMann, supra, 387 F.2d at 522; Howard v. Smyth, 365 F.2d 428 (4 Cir. 1966), cert. denied, 385 U.S. 988, 87 S.Ct. 599, 17 L.Ed.2d 449."

We should be even more alert where one of the basic underpinnings of the "hands off" policy is absent. Incarceration after conviction is imposed to punish, to deter, and to rehabilitate the convict. See Rudolph v. Alabama, 1963, 375 U.S. 889, 84 S.Ct. 155, 11 L.Ed.2d 119 (Goldberg, J., dissenting). Some freedom to accomplish these ends must of necessity be afforded prison personnel. Conversely, where incarceration is imposed prior to conviction, deterrence, punishment, and retribution are not legitimate functions of the incarcerating officials. Their role is but a temporary holding operation, and their necessary freedom of action is concomitantly diminished.

Plaintiffs here were unconvicted misdemeanants held for bond. The purpose of incarceration of them was simply detention in order to assure presence at trial. Punitive measures in such a context are out of harmony with the presumption of innocence. Despite their pigmentation or political beliefs the accused here cannot be treated as though convicted of heinous crimes. In Butler v. Crumlish, E.D.Pa.1964, 229 F.Supp. 565, 567, quoting Commonwealth v. Brines, 1920, 29 Pa.Dist. & Co.R. 1091, the court phrased the matter as follows:

"It seems to be forgotten that an accused is not a convict, and that it is only strong necessity that compels his detention *before trial*. It is a restraint of the liberty of his person which is unavoidable. It certainly should not be aggravated by the infliction of any unnecessary indignity."

We must therefore review the cruel and unusual punishment allegations with the thought in mind that the treatment involved was inflicted upon persons not convicted of any crime.

The cruel and unusual punishment clause is a nonstatic, moral precept designed to curb treatment which offends contemporary standards of decency. Until the early part of this century, the ban on cruel and unusual punishment had been interpreted to apply only to outrageous and barbarous practices. *See generally* Goldberg & Dershowitz, Declaring the Death Penalty Unconstitutional, 83 Harv.L.Rev. 1773 (1970); Note, The Cruel and Unusual Punishment Clause and the Substantive Criminal Law, 79 Harv.L.Rev. 635 (1966). The concept has now expanded, but its precise boundaries are still unclear. Wilkerson v. Utah, 1878, 99 U.S. 130, 135–136, 25 L.Ed. 345 ("Difficulty would attend the effort to define with exactness the extent of the constitutional provision which provides that cruel and unusual punishment shall not be inflicted. * * *"); Trop v. Dulles, 1958, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630. Courts have relied upon such im-

precise measures as the protection of "the dignity of man," Trop v. Dulles, *supra,* 356 U.S. at 100, 78 S.Ct. 590, or "developing concepts of elemental decency," Jordan v. Fitzharris, *supra,* 257 F. Supp. at 679. In *Jordan* the court attempted to elucidate the scope of the concept:

> " 'What constitutes a cruel and unusual punishment has not been exactly decided.' Weems v. United States, 217 U.S. 349, 368, 30 S.Ct. 544, 549, 54 L.Ed. 793 (1910). This statement is as true today as it was in 1910. It is possible, however, to identify three general approaches to the question. See Rudolph v. Alabama, 375 U.S. 889, 890–891, 84 S.Ct. 155, 11 L.Ed.2d 119 (1963), (dissenting opinion of Goldberg, J.). The first approach is to ask whether under all the circumstances the punishment in question is 'of such character * * * as to shock general conscience or to be intolerable to fundamental fairness.' Lee v. Tahash, supra, 352 F.2d at page 972. Such a judgment must be made in the light of developing concepts of elemental decency. Weems v. United States, supra, 217 U.S. at 378, 30 S.Ct. 544; Trop v. Dulles, 356 U.S. 86, 100–101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (opinion of Warren, C. J.); Rudolph v. Alabama, supra, 375 U.S. at 890, 84 S.Ct. at 155 (dissenting opinion of Goldberg, J.). Secondly, a punishment may be cruel and unusual if greatly disproportionate to the offense for which it is imposed. Weems v. United States, supra; Robinson v. State of California, supra, [370 U.S.] at 676, 82 S.Ct. 1417, 8 L.Ed.2d 758 (concurring opinion of Douglas, J.); Rudolph v. Alabama, supra, 375 U.S. at 891, 84 S.Ct. at 155 (dissenting opinion of Goldberg, J.). Finally, a punishment may be cruel and unusual when, although applied in pursuit of a legitimate penal aim, it goes beyond what is necessary to achieve that aim; that is, when a punishment is unnecessarily cruel in view of the purpose for which it is used. Weems v. Unit-

ed States, supra, 217 U.S. at 370, 30 S.Ct. 544; Robinson v. California, supra, 370 U.S. at 677, 82 S.Ct. 1417 (concurring opinion of Douglas, J.); Rudolph v. Alabama, supra, at 891, 84 S.Ct. at 155 (dissenting opinion of Goldberg, J.)."

257 F.Supp. at 679.

■ Despite the subjective content of such notions, it is clearly accepted that the amendment prohibits certain hard core inhuman treatment. Trop v. Dulles, *supra,* 356 U.S. at 101, 78 S.Ct. 590. And, since Cooper v. Pate, 1964, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (per curiam), it has been clear that inmates have recourse to the amendment's protections through section 1983. *See generally* Hirschkop & Millemann, The Unconstitutionality of Prison Life, 55 Va.L.Rev. 795 (1969).

In this light we think that the undisputed treatment accorded plaintiffs in the maximum security unit at Parchman violated even those minimal "standards of decency" mandated in the treatment of convicted felons, Trop v. Dulles, *supra,* 356 U.S. at 100, 78 S.Ct. 590, much less the standards which must be afforded those as yet unconvicted of misdemeanor offenses. It would be well to quote in full that portion of the pre-trial stipulation relating to the treatment at Parchman:

> "The buses arrived at Parchman early Sunday morning October 3, 1965 and proceeded to the compound containing penitentiary's Maximum Security Unit. The maximum security building has two wings, each divided into two cell blocks with 13 cells each, for a total of 52 cells. One of the four cell blocks, containing 13 cells is Parchman's 'Death Row'. Each cell contained two steel bunk beds, a toilet and a wash basin. Three of the cell blocks, excluding Death Row, containing a total of 39 cells, had been vacated to receive the Natchez prisoners.

> "The men prisoners, including all the male plaintiffs that had been arrested on Saturday were required to

strip naked and consume a quantity of laxative. They were inspected and searched. The men were then placed in cells. The female prisoners, including all the female plaintiffs that had been arrested on Saturday were required to remove their shoes, stockings, sweaters, coats, jewelry and wigs, but not their undergarments, dresses, blouses, and pants, and were searched by female employees and trustees. They also were given a quantity of laxative. The women were then placed in cells. The prisoners were segregated by sex but not race. No one was permitted to carry any personal belongings into their cells including medicines and sanitary napkins. * * *

"Prior to release of the prisoners, many, including many of the plaintiffs, had blood samples taken from them."

These admitted facts standing alone come within the rationale of a number of cases which have found a violation of the Eighth Amendment. The situation becomes even more aggravated by additional undisputed facts, including forced nudity of some of plaintiffs for up to 36 hours, inadequate hygienic facilities, an absence of bedding, cramped, cold quarters and physical and mental abuse. On similar facts, but involving convicted inmates, the court in Knuckles v. Prasse, E.D.Pa.1969, 302 F.Supp. 1036, held cruel and unusual a period of detention of 2½ days in cramped quarters, without clothing or bedding, and without toilet articles:

"Finally, there is the question of the two and one-half days spent by the plaintiffs, two to a cell—six feet by nine feet, eleven inches. The cells had no windows and no artificial light. Each cell had only a single bed and the cells were damp and foul smelling from water splashing on the floor as a result of malfunctioning toilets. The men were given no clothing or bedding, save two blankets, which had to be used to absorb water from the overflowing toilet and further as a mattress. The men were given no soap, no towels, no toilet tissue, no toilet articles.

"The conditions were somewhat less severe but still quite similar to those described by the court in Wright v. McMann, 2 Cir., 387 F.2d 519. There the solitary confinement cell was described as 'dirty, filthy and unsanitary, without adequate heat and virtually barren; the toilet and sink were encrusted with slime, dirt and human excremental residue * * *'. The plaintiff was kept completely nude for eleven days and was denied all hygienic implements and utensils.

"While petitioners here were faced with a damp cell and not a freezing one, and while there were no physical beatings and the period of confinement in question was two and one-half days and not eleven days, still I fully concur with the view of Judge Kaufman in the Wright v. McMann case * * *." 302 F.Supp. at 1061–1062.

In Wright v. McMann, *supra*, the court condemned the use of a "strip cell," once again utilized against convicted inmates:

"We are of the view that civilized standards of humane decency simply do not permit a man for a substantial period of time to be denuded and exposed to the bitter cold of winter in northern New York State and to be deprived of the basic elements of hygiene such as soap and toilet paper. The subhuman conditions alleged by Wright to exist in the 'strip cell' at Dannemora could only serve to destroy completely the spirit and undermine the sanity of the prisoner. The Eighth Amendment forbids treatment so foul, so inhuman and so violative of basic concepts of decency. Trop v. Dulles, 356 U.S. 86, 100, 101, 78 S.Ct. 590, 597, 598, 2 L.Ed.2d 630 (1958)." 387 F.2d at 526.

*See also* Sostre v. Rockefeller, S.D.N.Y. 1970, 312 F.Supp. 863; Jordan v. Fitzharris, *supra*.

Likewise the treatment to which the plaintiffs here were subjected not only violates "developing concepts of elemental decency," but also is "greatly disproportionate to the offense for which it is imposed." Jordan v. Fitzharris, *supra*, 257 F.Supp. at 679. Like Cain, these plaintiffs bear the stigma of having served in the penitentiary for violating a misdemeanor ordinance besotted with constitutional infirmities. They were not felonious terrorists or hardened recidivists—the treatment in the maximum security unit was totally unfounded. If similar treatment for convicted prisoners is universally condemned, which it is, that treatment has no place here. We deal with human beings, not dumb, driven cattle.

We think the language of the court in Hancock v. Avery, M.D.Tenn.1969, 301 F.Supp. 786, is particularly instructive:

"Applying both of these tests to the instant case, the Court finds that the effect of confining plaintiff in the dry cell under the conditions shown to have existed was to subject him to cruel and unusual punishment in violation of the Eighth Amendment. The conditions of his dry cell confinement are such as to make it evident that fundamental concepts of decency did not prevail. Particularly barbaric are the facts that plaintiff is forced to sleep in the nude on a bare concrete floor without even the comfort of a blanket and that he is deprived at all times of adequate light and ventilation. Equally offensive is the fact that he is provided with no means by which he can maintain his personal cleanliness, with the result that he is forced to live and eat under animal-like conditions. The debasing conditions to which plaintiff is subjected offend more than some mere "fastidious squeamishness or private sentimentalism." Rochin v. People of California, 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952). It is clear that requiring a prisoner to live, eat and sleep in such degrading circumstances does violence to civilized standards of human decency. Wright v. McMann, *supra*; Jordan v. Fitzharris, *supra*.

"It is also apparent that the dry cell punishment, as administered in the instant case, is unnecessarily cruel in view of the purpose for which it is used. The stated aims in confining plaintiff in the dry cell were to protect him from self-inflicted injury,[1] to protect the general prison population and personnel from violent acts on his part, and to prevent his escape. Solitary confinement for the purpose of achieving such goals is not per se an unconstitutional form of punishment. Graham v. Willingham, *supra*, [384 F.2d 367, (10 Cir.)]. However, the Court is of the opinion that such goals can be attained without requiring a prisoner to live in the exacerbated conditions of filth and discomfort demonstrated in the instant case. Where prison officials impose such deplorable living conditions in conjunction with solitary confinement, the Court is compelled to find that cruel and unusual punishment has been imposed in violation of the Constitution.

"While it is true, as the defendants assert, that all imprisonment is to an extent inhumane, this fact does not excuse the imposition of forms of punishment so harsh as to violate basic standards of human decency." 301 F.Supp. at 791–792.

Defendants have offered no real justification for the treatment imposed at Parchman other than to contend that the treatment was merely the standard operating procedure for the maximum security unit.[6] But since we hold that

6. Defendants do argue that the blood tests were medically justifiable because of the prevalence of venereal disease in certain of the plaintiffs. Assuming arguendo that such a justification would validate the indiscriminate taking of blood samples demonstrated here, it is clear from the record that Breazeale's assertion of this justification was held inadmissible.

procedure unlawful, defendants cannot escape liability because they customarily indulged in such illegal actions. We therefore hold that plaintiffs should be granted judgment as a matter of law on liability under section 1983 since the treatment imposed at Parchman was violative of the Eighth Amendment.

 Similarly, liability should be imposed under the pendent state claims, for Mississippi recognizes that its prisoners must be afforded civilized treatment. Thus, the general common law duty of the custodian of a prisoner to take proper care of him is specifically imposed on the penitentiary superintendent in Mississippi by statute. Miss.Code Ann. § 7930 (Supp.1968).[7] See generally Roberts v. Williams, N.D. Miss.1969, 302 F.Supp. 972, 985–986. The force of this rule is even stronger where a person not convicted but merely detained pending posting of bond is concerned. See Farmer v. State, Miss.1955, 79 So.2d 528. Mississippi law simply would not tolerate the inhuman treatment accorded plaintiffs at Parchman. We therefore find that plaintiffs should be granted judgment on liability as a matter of law on their pendent state claims.

## IV.

 Plaintiffs next allege that the course of events which transpired in October, 1965, constitute federal and state causes of action for false imprisonment. While such an action rests basically in tort, usually the province of state law, it is now clear that false imprisonment can be the type of "constitutional tort" cognizable under section 1983. See Whirl v. Kern, supra. We therefore turn to the various grounds which plaintiffs

contend require a finding of false imprisonment as a matter of federal and state law.

### A. False Arrest

Plaintiffs contend that their arrest for parading without a permit is actionable because the ordinance under which the arrests were made was unconstitutional. The Natchez parade ordinance made it "unlawful for any person or persons without the written permission of the Chief of Police of the City of Natchez * * * to conduct or participate in any parade or marching" on the city streets or sidewalks. Such an ordinance was plainly unconstitutional. See, e. g., Hague v. CIO, 1939, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423; Cox v. Louisiana, 1965, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471, but the particular Natchez enactment had not been considered judicially at the time the plaintiffs were arrested. See generally Guyot v. Pierce, 5 Cir. 1967, 372 F.2d 658.

Plaintiffs' claim that the police officers' conduct constituted false arrest as a matter of federal law is governed by the Supreme Court's decision in Pierson v. Ray, 1967, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288. There the Court held that a police officer could not be held liable under section 1983 for false arrest because of an unconstitutional statute if he acted with probable cause and with a good faith belief in the validity of the statute. The Court stated:

"The common law has never granted police officers an absolute and unqualified immunity, and the officers in this case do not claim that they are entitled to one. Their claim is rather that they should not be liable if they acted in good faith and with probable

---

7. § 7930. Management and control of prison system to be vested in superintendent.

The superintendent, hereinafter provided for, shall be vested with the exclusive management and control of the prison system, and all properties belonging thereto, subject only to the limitations of this act and shall be responsible for the management of affairs of the prison system and for the proper care, treatment, feeding, clothing and management of the prisoners, confined therein. The superintendent shall have sole authority to employ and discharge employees.

See also Miss.Code Ann. §§ 7921, 7932 (Supp.1968) ; cf. Miss.Code Ann. § 7915 (Supp.1968).

cause in making an arrest under a statute that they believed to be valid. Under the prevailing view in this country a peace officer who arrests someone with probable cause is not liable for false arrest simply because the innocence of the suspect is later proved. Restatement, Second, Torts § 121 (1965); 1 Harper & James, The Law of Torts § 3.18, at 277–278 (1956); [State of Missouri ex rel. and to Use of] Ward v. Fidelity & Deposit Co. of Maryland, 179 F.2d 327 (C.A.8th Cir. 1950). A policeman's lot is not so unhappy that he must choose between being charged with dereliction of duty if he does not arrest when he has probable cause, and being mulcted in damages if he does. Although the matter is not entirely free from doubt, the same consideration would seem to require excusing him from liability for acting under a statute that he reasonably believed to be valid but that was later held unconstitutional, on its face or as applied. * * *

"We hold that the defense of good faith and probable cause, which the Court of Appeals found available to the officers in the common-law action for false arrest and imprisonment, is also available to them in the action under § 1983. * * * * " 386 U.S. at 555, 557, 87 S.Ct. at 1218, 1219 (footnotes omitted).

 Plaintiffs argue that the police officers could not have reasonably believed the ordinance in question was constitutional. It is true that numerous judicial decisions prior to 1965 had made it clear that statutes which conferred unbrìdled discretion upon a public official to grant or deny the exercise of expressive activity were invalid. Simple unawareness of the names and dates of those relevant decisions would not confer

immunity. We do not think, however, that the facts of this case warrant finding as a matter of law that Robinson knew of the unconstitutionality of the ordinance. The *Pierson* test is a subjective one, which of necessity raises questions of credibility, usually within the province of the jury. Here there was testimony from Robinson that he believed he was doing his duty as a peace officer in arresting plaintiffs. While the status of constitutional development is a relevant countervailing consideration, at the time of the occurrences at issue here, there was no judicial decision from either this court or the Mississippi state courts explicitly ruling on either the Natchez or identical ordinances. *See* Guyot v. Pierce, *supra*; King v. City of Clarksdale, Miss.1966, 186 So. 2d 228. We therefore think that there was sufficient evidence to raise an issue of the *Pierson* defense. The court below submitted this issue under proper instructions, and we are thus bound by the jury determination of no liability.

A similar result obtains under the pendent state claim for Mississippi follows the *Pierson* rule, which is itself grounded in the common law. *See* Golden v. Thompson, Miss.1943, 11 So.2d 906.[8] We therefore affirm the verdict below which found that defendants are immune from liability for false arrest.

### B. Failure to Take Plaintiffs Before a Magistrate

The record clearly reveals that defendants neither took any of plaintiffs before a judicial officer nor made any attempt to do so. Plaintiffs thus argue that even if the initial arrest was valid under *Pierson,* the subsequent incarceration is actionable. While the law does not exact constitutional erudition from those unschooled in jurisprudence, plaintiffs contend that we must compel respect for individual liberty to the extent

---

8. Plaintiffs argue that even if Chief Robinson established a *Pierson* defense, officers Rickard, Cowart, and Beach, who participated in the arrests, still are liable for they offered no testimony at trial. We reject.this contention. These officers were simply following the orders of Chief Robinson so that his immunity should extend to them.

of requiring officials to follow procedures clearly delineated by statutory or common law mandates. In such a situation, plaintiffs argue, the "good faith" defense of *Pierson* is inapplicable. *See* Whirl v. Kern, *supra.*

■ It is true that unreasonable or unnecessary delay in bringing a prisoner before a magistrate, despite good faith, may give rise to an action for false imprisonment. Cooley v. Stone, 1969, 134 U.S.App.D.C. 317, 414 F.2d 1213; Czap v. Marshall, 7 Cir. 1963, 315 F.2d 766, cert. denied, 375 U.S. 942, 84 S.Ct. 348, 11 L.Ed.2d 273; Moran v. City of Beckley, 4 Cir. 1933, 67 F.2d 161; Fulford v. O'Connor, 1954, 3 Ill. 490, 121 N.E.2d 767; 35 C.J.S. False Imprisonment § 30. The cause of action arises from the uniform requirement, both state and federal, of prompt presentation before a magistrate. *See, e. g.,* Fed.R.Crim.P. 5(a), *as construed in* Mallory v. United States, 1957, 354 U.S. 449, 77 S.Ct. 1356, 1 L. Ed.2d 1479; Czap v. Marshall, *supra,* 315 F.2d at 770.

■ Nevertheless, we hold that plaintiffs have failed to state a cause of action under section 1983, for they have not demonstrated a violation of their constitutional rights. As we said in Kulyk v. United States, 5 Cir. 1969, 414 F. 2d 139, 141–142, "[t]he right under the federal rules to be promptly taken before a magistrate has not been given constitutional status and has not been applied to persons in state custody." *See also* Edwards v. Holman, 5 Cir. 1965, 342 F.2d 679, cert. denied, 384 U. S. 1017, 86 S.Ct. 1934, 16 L.Ed.2d 1039. Similarly, even though the failure to take plaintiffs before a magistrate violates Mississippi law, it does not rise to the status of a denial of due process. Scarbrough v. Dutton, 5 Cir. 1968, 393 F.2d 6; Baxter v. Rhay, 9 Cir. 1959, 268

F.2d 40; United States ex rel. Weber v. Ragen, 7 Cir. 1949, 176 F.2d 579, cert. dismissed, 338 U.S. 809, 70 S.Ct. 49, 94 L.Ed. 489. *But see* Goodwin v. Page, E.D.Okl.1969, 296 F.Supp. 1205, aff'd on other grounds, 10 Cir., 418 F.2d 867. Plaintiffs' federal allegations therefore must fall.

■ The same result does not obtain, however, under plaintiffs' pendent state claim. Mississippi law clearly holds that delay in bringing a prisoner before a magistrate may give rise to an action for false imprisonment. Dunning v. State, 1965, 251 Miss. 766, 171 So.2d 315, cert. denied, 386 U.S. 993, 87 S.Ct. 1310, 18 L.Ed.2d 339; Sheffield v. Reece, 1947, 201 Miss. 133, 28 So.2d 745; Anderson v. Beck, 1886, 64 Miss. 113, 8 So. 167. By statute "every person making an arrest shall take the offender before the proper officer without unnecessary delay for examination of his case." Miss.Code Ann. § 2473. What constitutes unreasonable or unnecessary delay, of course, must be determined from the facts and circumstances of each case. *See* Czap v. Marshall, *supra.*

■ Defendants have attempted to meet their burden of justification by arguing that the failure was reasonable due to the large number of arrests, the weekend days on which the arrests were made, and the availability of a bonding procedure.[9] However, defendants have not demonstrated that these factors either frustrated any attempt to secure a magistrate or negated the obligation to do so. It is true that a number of those arrested were apparently permitted to make bond and thus to secure their release. As to those prisoners, many of the compelling reasons recognized by Mississippi law for immediate presentation for inquiry into the

---

9. Defendants also argue that plaintiffs' counsel removed their cases to federal court on Monday, October 4, so that the prisoners were no longer the responsibility of the state officials. See 28 U.S.C.A. § 1446(f). A review of the record clearly shows, however, that in fact there was no removal which would have relieved state officials of their state law obligation to bring plaintiffs before a magistrate.

merits of the accusation disappear. But the Mississippi courts clearly hold that the theoretical availability of a bonding procedure does not immunize the incarceration of those arrested who either cannot make bond immediately or who were not permitted to do so. The sterile opportunity to make bond does not abate the right to a magistratical confrontation. *See* Sheffield v. Reece, *supra*, 28 So.2d at 746. It was the duty of the Natchez authorities to attempt to bring those who did not execute bond before a magistrate, rather than to herd them pell mell off to Parchman. Nor was this duty relinquished by the mere fact that there was a large number of arrests on a weekend. Mass arrests may create problems for the arresting officers, but the officers must make a reasonable effort to meet those problems in order to avoid the charge of "unnecessary delay." There is nothing in this record to demonstrate that an unsuccessful attempt was made to secure a magistrate for any of the plaintiffs. In fact the record shows that no attempt was made. Similarly, we cannot hold that Mississippi would consider that its laws are so Sabbatized that they are automatically suspended over the weekend. *Cf.* Sheffield v. Reece, *supra*, 28 So.2d at 748–749. The case might be different if it were shown that a magistrate was unavailable, but no such showing was made here. Indeed it is questionable whether such a showing could have been made. Magistrates in Mississippi have authority to hear cases on both Saturday and Sunday. *See* Sheffield v. Reece, *supra*, 28 So.2d at 748. And there is no justification whatsoever for failure to bring those still incarcerated before a magistrate on Monday, October 4, which was the next date scheduled for a regular session of the local police court. On the basis of these undisputed facts, we hold

that plaintiffs' state rights were violated. Judgment is therefore rendered for plaintiffs on liability as a matter of law.

█ Plaintiffs have raised other claims which, they contend, also compel a finding of liability for false imprisonment.[10] These claims do not rise to constitutional dimensions so that we must affirm judgment for defendants under section 1983. We also decline plaintiffs' invitation to nevertheless engage in the complexities surrounding the construction of these numerous Mississippi statutes under our pendent jurisdiction, for we find that plaintiffs' allegations simply constitute cumulative grounds which are subsumed under our basic finding of liability for false imprisonment lodged upon the failure to bring plaintiffs before a magistrate. *See* UMW v. Gibbs, *supra*, 383 U.S. at 726, 86 S.Ct. at 1139, 16 L.Ed.2d 218 ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law").

## V.

We come now to the question of the responsibility of the individual defendants in light of our holding that plaintiffs should be granted judgment on liability (1) under state law for failure to bring them before a magistrate, and (2) under federal and state law for infliction of cruel and unusual punishment at Parchman.

Plaintiffs argue that each defendant is liable for the entire wrong. Robinson, assisted by Rickard, Cowart, Beach, Flowers, and Cameron, was in charge of the detention in Natchez and was responsible for the failure to attempt to secure a magistrate. These defendants also were responsible for the delivery of the

10. Thus, plaintiffs contend that minor plaintiffs were falsely imprisoned because of defendants' failure to follow the procedures of Mississippi's Youth Court Act. See note 3 supra. Likewise, plaintiffs argue that they were falsely imprisoned because their transfer to Parchman by the municipal authorities was in violation of Miss.Code Ann. § 3374–135 (Supp. 1968), which specifies the procedures to be followed in transferring municipal prisoners to the state penitentiary.

prisoners to highway patrolmen, under the statutory supervision and control of Birdsong, for transportation to Parchman. There, highway patrolmen and Natchez firemen acting under orders of Robinson and Cameron assisted in processing and detaining plaintiffs. Finally, Breazeale supervised the detention at the penitentiary and directed the manner of treatment in the maximum security unit. Nosser, while opposed to these actions, failed to act despite his position as mayor of the community.

Defendants, on the other hand, would have us attentuate responsibility. But to follow defendants' logic to its extreme would result in the total exculpation of defendants despite their participation in a chain of events which we have found to be illegal and unjustified.

We instead begin by emphasizing that section 1983 "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions." Monroe v. Pape, *supra,* 365 U.S. at 187, 81 S.Ct. at 484, 5 L.Ed.2d 492; Whirl v. Kern, *supra.* The pendent state grounds incorporate the similar rule of Mississippi. *See* Smith v. Patterson, Miss.1952, 214 Miss. 87, 58 So.2d 64; Bacon v. Bacon, Miss.1899, 76 Miss. 458, 24 So. 968. This general rule of liability provides that "all those who, in pursuance of a common plan or design to commit a tortious act, actively take part in it, or further it by cooperation or request, or who lend aid or encouragement to the wrongdoer, or ratify and adopt his acts done for their benefit, are equally liable with him." W. Prosser, Law of Torts 59 (3d ed. 1964). So long as there is "an intent to bring about a result which will invade the interests of another in a way that the law will not sanction" good faith is no defense. *Id.* at 31; *see*

Whirl v. Kern, *supra*; State for Use of Powell v. Moore, 1965, 252 Miss. 471, 174 So.2d 352.

In view of these principles we think that the conduct involved here must be viewed as a continuum, beginning with the illegal incarceration for failure to bring plaintiffs before a magistrate and ending with the inhuman treatment at Parchman. Each incident flowed proximately and naturally into the other so that each defendant who played "a substantial role in bringing about the results" is liable jointly and severally for the entire injury and wrong. *See* Nesmith v. Alford, 5 Cir. 1963, 318 F.2d 110, 119, cert. denied, 375 U.S. 975, 84 S.Ct. 489, 11 L.Ed.2d 420. Thus, Chief Robinson and police officers Rickard, Cowart, Beach, and Flowers[11] played substantial roles in detaining plaintiffs, denying them access to a magistrate, and transporting them to Parchman where they would be subjected to maximum security treatment. Fire Chief Cameron assisted these police officers in the detention and ordered Natchez firemen both to escort the buses to Parchman and to remain at the penitentiary for the duration of the incarceration. Finally, Breazeale supervised and directed the treatment and detention at Parchman. This was a typical "chain of command" situation. As we said in *Nesmith:*

"As to the issue of individual liability, each of the three defendants—Sullivan, Ruppenthal and Alford—acted as one. Although there was no prior plan devised to bring about the arrest and imprisonment of the plaintiffs, each of the three had a substantial role in bringing about the results. This was an instance of the typical 'chain of command,' Sullivan indicating to Ruppenthal that the Plaintiffs

11. These officers, of course, were acting under the orders of Chief Robinson. Nevertheless
"An inferior officer or deputy is personally liable for any misconduct of which he may be guilty in making or causing a wrongful arrest or detention, that the arresting officer is acting under orders or directions of his superiors ordinarily being no defense * * *." 35 C.J.S. False Imprisonment § 42, at 703; see Nesmith v. Alford, supra.

should be removed from the cafe, Ruppenthal giving the authoritative commands constituting the arrest, and Alford providing the essential transportation at the direction of Ruppenthal. Their actions throughout the whole sequence of events are so intertwined and interlocking that these Defendants must fall together." 318 F.2d at 119.

On the other hand, we must sustain the findings of no liability on the part of Mayor Nosser and Commissioner of Public Safety Birdsong. Plaintiffs argue that Mayor Nosser, upon learning of the occurrences in Natchez, either should have called a special meeting of the Board of Aldermen in order to try to persuade them to rescind the transferral to Parchman or should have attempted to persuade Breazeale to release the prisoners. However, we do not think that Mayor Nosser's failure to act renders him liable. The record reveals that Nosser learned of what was happening only on Sunday, October 5, and at that time made it clear that he opposed the conduct of the defendants. There is no evidence that he could have called together a quorum of the Board of Aldermen speedily or that, once called, his point of view would have prevailed. Indeed, the evidence is to the contrary. Three of the six aldermen, in addition to the named defendants, directly or indirectly participated in the events at the heart of this case. Without the support of the Board, the Mayor was powerless to halt the course of events since his

municipal powers were circumscribed. In such a situation, we do not find that Nosser had a duty to act under penalty of damages. *See* W. Prosser, *supra*, at 338–39. He cannot be required to do an act which would have been useless or ineffective.

It was stipulated that Commissioner Birdsong was charged by law with the duty of supervision and control of all Mississippi Highway Safety Patrolmen.[12] However, there is no evidence that he participated in, had knowledge of, or was negligent with regard to the actions of the highway patrolmen who assisted in the detention and transportation of plaintiffs. Lower courts have uniformly held that

"[t]he chief of police would not be responsible for the wrongful acts of the officer unless he was present or unless it is shown he directed such acts or personally cooperated in them * * *." Jordan v. Kelly, W.D.Mo. 1963, 223 F.Supp. 731, 739.

*Accord,* Burnett v. Short, S.D.Tex.1970, 311 F.Supp. 586; Sanberg v. Daley, N.D.Ill.1969, 306 F.Supp. 277; Mack v. Lewis, S.D.Ga.1969, 298 F.Supp. 1351; Patrum v. Martin, W.D.Ky.1968, 292 F.Supp. 370; Pritchard v. Downie, E.D. Ark.1963, 216 F.Supp. 621, aff'd on other grounds, 8 Cir., 326 F.2d 323; *cf.* Robertson v. Sichel, 1888, 127 U.S. 507, 8 S.Ct. 1286, 32 L.Ed. 203. We think that on the facts of this case this rule is equally applicable to defendant Birdsong and requires a finding of no liability on his part.[13] We therefore find that de-

12. See Miss.Code Ann. § 8078 (Supp. 1968). In actuality this section provides that another official, the "Chief of Patrol," shall have authority over the "division of operations of the patrol." While the Commissioner has authority to employ members of the patrol, *id.* § 8079, in most instances he does not have the power of dismissal. *Id.* § 8081.

13. We emphasize that this holding with regard to the nonliability of defendant Birdsong is limited to the facts of this case and may not be applicable to other officials. For example, both the common law and judicial decisions under the fed-

eral civil rights acts seemingly recognize a broader liability on the part of sheriffs and wardens. See, e. g., Bethea v. Crouse, 10 Cir. 1969, 417 F.2d 504, 507 n. 2; Whirl v. Kern, supra, 407 F.2d at 795–796; Talley v. Stephens, E.D.Ark.1956, 247 F.Supp. 683, 692; Note, Tort Liability of Law Enforcement Officers: State Remedies, 24 La.L.Rev. 130 (1968); 80 C.J.S. Sheriffs and Constables §§ 52, 55, 117. Likewise, we do not decide whether the doctrine of *respondeat superior* has vitality in a suit under section 1983. Compare Nugent v. Sheppard, N.D.Ind.1970, 318 F.Supp. 314, 315 (doc-

fendants Nosser and Birdsong may not be held liable under the facts of this case.

Defendants would have us extend this finding of nonliability by arguing that they are protected by the doctrine of official immunity from damages. *See generally* Jaffe, Suits Against Govern-

ments and Officers: Damage Actions, 77 Harv.L.Rev. 209 (1963); Note, The Doctrine of Official Immunity Under the Civil Rights Act, 68 Harv.L.Rev. 1229 (1955). In Norton v. McShane, 5 Cir. 1964, 332 F.2d 855, cert. denied, 380 U.S. 981, 85 S.Ct. 1345, 14 L.Ed.2d 274, we found that various federal executive

trine does not apply), Sanberg v. Daley, supra, 306 F.Supp. at 278 (same), Roberts v. Williams, supra, 302 F.Supp. at 987 (same), with Hill v. Toll,. E.D.Pa. 1970, 320 F.Supp. 185 (doctrne applies). See also Nesmith v. Alford, supra, 318 F.2d at 126; Runnels v. Parker, C.D. Cal.1967, 263 F.Supp. 271; 35 C.J.S. False Imprisonment § 42. As the court in *Jordan* impliedly noted, many of the factors upon which *respondeat superior* is based are absent when dealing with police supervisors:

"We come next to the question of the liability of the defendant Chief of Police. The decisions are not in harmony as to the exact scope of the liability of sheriffs, constables, marshals or other peace officers for acts of their deputies. There is a difference of judicial opinion in the various states. This is the result, to some extent, of statutory provisions and also the question as to whether or not the deputies are acting by virtue of their office and acts done under color of office. 47 Am.Jur. 158; Foley v. Martin, 142 Cal. 256, 71 P. 165, 75 P. 842, 100 Am.St.Rep. 123; State to Use of Russell et ux. v. Moore et al., 19 Mo. 369; State of Mo. ex rel. and to Use of De Vault v. Fidelity & Casualty Co. of N. Y., 8 Cir., 107 F.2d 343.

"The rule is different however, with respect to the Chief of Police of a municipal police department. Even though he may be charged with the duty of selecting the members of the force, he is not responsible for their acts unless he has directed such acts to be done, or has personally cooperated in the offense, for each police officer, is like himself, a public servant. Casey v. Scott, 82 Ark. 362, 101 S.W. 1152, 118 Am.St.Rep. 80, 12 Ann.Cas. 184; Baisley v. Henry, 55 Cal.App. 760, 204 P. 399; Michel v. Smith, 188 Cal. 199, 205 P. 113, 12 A.L.R. 980, 34 A.L.R. 561; Pritchard v. Downie, 216 F.Supp. 621 (E.D.Ark., 1963).

\* \* \* \* \*

"Another case in which the liability of the chief of police for the acts of the deputy or police officer was discussed, is Pavish v. Meyers, 129 Wash. 605,

225 P. 633, 34 A.L.R. 561. There the court stated:

" 'But the courts have very generally drawn a distinction between a sheriff and a chief of police, holding that the deputies of the former are selected by the sheriff and act purely as his representatives, but that police officers are generally not selected exclusively by the chief of police, and are themselves officers and do not act for the chief of police in the performance of their official duties.'

"Casey v. Scott, supra, 82 Ark. 362, 101 S.W. 1152 (Ark.) also involved the question of liability of a chief of police for his police officers. There the court stated:

" 'A sheriff is responsible for his deputies, for they are acting in his private service in his name and stead, and are only public officers through him. A chief of police may select a police force, but he is not responsible for their acts, as each policeman is a public servant himself. So under this ordinance, the dog catcher was a public servant selected by the chief of police just as a patrolman would be selected by him, or a mayor or other appointing power. There is no liability in such cases, unless the appointing officer fails to exercise reasonable care in the selection of the appointee—a question not presented here.'

"Very clearly the general rule with respect to the liability of a chief of police applies to this case. The statutes clearly require that the officers of the police force of Kansas City be selected by the chief of police from a list of those who have qualified pursuant to an examination, and the chief of police is required under the law to make all selections from that list, and such officers are in no sense the personal appointees of the chief of police.

"The police officers are public officials just as the chief of police is a public official, and their duties are prescribed by the authority under which their positions are created."
Jordan v. Kelly, supra, 223 F.Supp. at 737–739.

officials were immune from tort liability under federal common law, where they "were acting within the scope of their authority or in the discharge of their duties." *See also* United States v. Faneca, 5 Cir. 1964, 332 F.2d 872. We were careful to point out, however, that the immunity doctrine might be different with regard both to common law actions against state officials, governed by state law, 332 F.2d at 860 n. 6, and to civil rights suits against state officials, governed by section 1983:

"Up to this time we have not referred to cases brought under the Civil Rights Acts, such as Lewis v. Brautigam, 5 Cir. 1955, 227 F.2d 124, 55 A.L.R.2d 505. The question involved in these cases is the extent, if any, to which the Civil Rights Acts have abrogated the immunity doctrine. While it is clear that the common-law immunity afforded legislative and judicial officers applies in suits under the Civil Rights Acts, there remains much uncertainty as to the extent to which immunity for subordinate executive officials applies, if it applies at all. In view of our conclusion later in this opinion that the instant suits are not within the purview of the Civil Rights Acts, we do not decide at this time the scope of official immunity under those statutes. We need only say that the doctrine may be given more limited application in those suits than it has been given at common law." 332 F.2d at 860–861.

While official immunity has been extended under section 1983 to legislative and judicial officers, Pierson v. Ray, *supra*; Tenney v. Brandhove, 1951, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019; Martone v. McKeithen, 5 Cir. 1969, 413 F.2d 1373, there has been a reluctance to stretch the doctrine too far, as was well expressed in Jobson v. Henne, 2 Cir. 1966, 355 F.2d 129, 133–134 (Footnotes omitted):

"Thus we reach the question whether these defendants by reason of their offices should be immune from the tort liability imposed by § 1983. The Civil Rights Acts in general, and § 1983 in particular, are cast in terms so broad as to suggest that in suits brought under these sections common law doctrines of immunity can never be a bar. Nevertheless, courts have narrowed the scope of these provisions by applying certain common law notions of official immunity from suit; it is now clear, for example, that the common law immunity from suit afforded legislative and judicial officers continues to have force in suits brought under the Civil Rights provisions. See generally, Note, The Doctrine of Official Immunity Under the Civil Rights Acts, 68 Harv.L.Rev. 1229 (1955).

"It should be equally clear that both the language and the purpose of the Civil Rights Acts are inconsistent with the application of common law notions of official immunity in all suits brought under these provisions. See Norton v. McShane, 332 F.2d 855, 861 (5 Cir. 1964) cert. denied, 380 U. S. 981, 85 S.Ct. 1345, 14 L.Ed.2d 274 (1965). In suits brought under § 1983 an indispensable element of a plaintiff's case is a showing that the defendant (or defendants) acted "under color of any statute, ordinance, regulation, custom, or usage, of any State * * *." 42 U.S.C. § 1983. This test can rarely be satisfied in the case of anyone other than a state official. See Collins v. Hardyman, 341 U.S. 651, 662, 71 S.Ct. 937, 95 L.Ed. 1253 (1951). To hold that all state officials in suits brought under § 1983 enjoy an immunity similar to that they might enjoy in suits brought under state law "would practically constitute a judicial repeal of the Civil Rights Acts." Hoffman v. Halden, 268 F.2d 280, 300 (9 Cir. 1959). Furthermore, and perhaps more basically, the purpose of § 1983 as well as the other Civil Rights provisions is to provide a federal remedy for the deprivation of federally guaranteed

rights in order to enforce more perfectly federal limitations on unconstitutional state action. To hold all state officers immune from suit would very largely frustrate the salutary purpose of this provision. We conclude the defense of official immunity should be applied sparingly in suits brought under § 1983. Cf. Robichaud v. Ronan, 351 F.2d 533 (9 Cir. 1965)."

 In the present case there can be no question of official immunity. The Mississippi common law recognizes no immunity for sheriffs, wardens, police officers, or firemen charged with false imprisonment or tortious treatment of prisoners. See, e. g., Sheffield v. Reece, supra; Farmer v. State, supra; State for Use of Powell v. Moore, supra; Vice v. Holley, 1906, 88 Miss. 572, 41 So. 7. Likewise, there is no immunity for these officials under section 1983. E. g., Whirl v. Kern, supra (sheriff); Joseph v. Rowlen, 7 Cir. 1968, 402 F.2d 367 (police officers); Cohen v. Norris, 9 Cir. 1962, 300 F.2d 24 (same); Wright v. McMann, supra (warden); Sostre v. Rockefeller, supra (same); Roberts v. Williams, supra (same); Beauregard v. Wingard, S.D. Cal.1964, 230 F.Supp. 167, 174 (same); see Monroe v. Pape, supra; Nesmith v. Alford, supra.

In conclusion, we have found that plaintiffs should be granted judgment as to liability (1) under section 1983 for cruel and unusual punishment and (2) under Mississippi state law for false imprisonment and mistreatment at Parchman. We hold that under the federal section 1983 claim defendants Robinson, Rickard, Cowart, Beach, Flowers, Cameron, and Breazeale are liable jointly and severally for the damages flowing from the illegal treatment at Parchman. Under the pendent state claims these defendants are liable jointly and severally for the damages flowing from the illegal incarceration following the arrests and the resulting treatment at Parchman. Judgment is reversed and rendered as to liability, leaving open for trial the question of damages, compensatory and punitive.

## VI.

Plaintiffs finally urge us to reverse the trial court's dismissal of the action prior to trial, with prejudice, as to 26 of the initial plaintiffs. This dismissal was ordered because of failure to answer written interrogatories propounded by defendants under Fed.R.Civ.P. 33.

Fed.R.Civ.P. 37, as it read in 1969,[14] provided several sanctions for failure to

14. Rule 37 provided in part:
 (b) Failure to Comply With Order.
 (1) *Contempt.* If a party or other witness refuses to be sworn or refuses to answer any question after being directed to do so by the court in the district in which the deposition is being taken, the refusal may be considered a contempt of that court.
 (2) *Other Consequences.* If any party or an officer or managing agent of a party refuses to obey an order made under subdivision (a) of this rule requiring him to answer designated questions, or an order made under Rule 34 to produce any document or other thing for inspection, copying, or photographing or to permit it to be done, or to permit entry upon land or other property, or an order made under Rule 35 requiring him to submit to a physical or mental examination, the court may make such orders in regard to the refusal as are just, and among others the following:
 (i) An order that the matters regarding which the questions were asked, or the character or description of the thing or land, or the contents of the paper, or the physical or mental condition of the party, or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order;
 (ii) An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting him from introducing in evidence designated documents or things or items of testimony, or from introducing

make discovery, including dismissal of the action. The trial court based its dismissal either on Rule 37(b) (2) (iii) or on 37(d). The validity of this action must be measured against the test set forth in Societe Internationale Pour

evidence of physical or mental condition;

(iii) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party;

(iv) In lieu of any of the foregoing orders or in addition thereto, an order directing the arrest of any party or agent of a party for disobeying any of such orders except an order to submit to a physical or mental examination.

\* \* \* \* \*

(d) Failure of Party to Attend or Serve Answers.

If a party or an officer or managing agent of a party wilfully fails to appear before the officer who is to take his deposition, after being served with a proper notice, or fails to serve answers to interrogatories submitted under Rule 33, after proper service of such interrogatories, the court on motion and notice may strike out all or any part of any pleading of that party, or dismiss the action or proceeding or any part thereof, or enter a judgment by default against that party.

Rule 37 was revised in 1970 to read in relevant particulars as follows:

(b) Failure to comply with order.

(1) *Sanctions by court in district where deposition is taken.* If a deponent fails to be sworn or to answer a question after being directed to do so by the court in the district in which the deposition is being taken, the failure may be considered a contempt of that court.

(2) *Sanctions by court in which action is pending.* If a party or an officer, director, or managing agent of a party or a person designated under Rule 30(b) (6) or 31(a) to testify on behalf of a party fails to obey an order to provide or permit discovery, including an order made under subdivision (a) of this rule or Rule 35, the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:

(A) An order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order;

(B) An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting him from introducing designated matters in evidence;

(C) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party;

(D) In lieu of any of the foregoing orders or in addition thereto, an order treating as a contempt of court the failure to obey any orders except an order to submit to a physical or mental examination;

(E) Where a party has failed to comply with an order under Rule 35(a) requiring him to produce another for examination, such orders as are listed in paragraphs (A), (B), and (C) of this subdivision, unless the party failing to comply shows that he is unable to produce such person for examination.

\* \* \* \* \*

(d) Failure of party to attend at own deposition or serve answers to interrogatories or respond to request for inspection. If a party or an officer, director, or managing agent of a party or a person designated under Rule 30(b) (6) or 31(a) to testify on behalf of a party fails (1) to appear before the officer who is to take his deposition, after being served with a proper notice, or (2) to serve answers or objections to interrogatories submitted under Rule 33, after proper service of the interrogatories, or (3) to serve a written response to a request for inspection submitted under Rule 34, after proper service of the request, the court in which the action is pending on motion may make such orders in regard to the failure as are just, and among others it may take any action authorized under paragraphs (A), (B), and (C) of subdivision (b) (2) of this rule. In lieu of any order or in addition thereto, the court shall require the party failing to act or the attorney advising him or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust.

The failure to act described in this subdivision may not be excused on the ground that the discovery sought is objectionable unless the party failing to act has applied for a protective order as provided by Rule 26(c).

Participations Industrielles et Commerciales, S. A. v. Rogers, 1958, 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255, and reiterated by us in such cases as Dorsey v. Academy Moving & Storage, Inc., 5 Cir. 1970, 423 F.2d 858; B. F. Goodrich Tire Co. v. Lyster, 5 Cir. 1964, 328 F.2d 411, and Read v. Ulmer, 5 Cir. 1962, 308 F.2d 915. *See also* 4 J. Moore, Federal Practice ¶ 37.03 [2.–1], [2.–5] (1970). In *Dorsey*, Judge Wisdom stated the following test:

"The sanctions available under Rule 37(b) for such conduct are predicated upon the presence of such factors as willful disobedience, gross indifference to the right of the adverse party, deliberate callousness, or gross negligence. The sanctions are not predicated upon a party's failure to satisfy fully the requirements of a production order when the failure 'was due to inability fostered neither by its own conduct nor by circumstances within its control'. Societe Internationale Pour Participations Industrielles et Commerciales, S. A. v. Rogers, 1958, 357 U.S. 197, 211, 78 S.Ct. 1087, 1095, 2 L.Ed.2d 1255, 1266.

"[The Rule] should not be construed to authorize dismissal * * * because of * * * noncompliance with a pretrial production order when it has been established that failure to comply has been due to inability, and not to willfulness, bad faith, or any fault of petitioner. 357 U.S. at 212, 78 S.Ct. at 1096.

"The rule is designed to empower the court to compel production of evidence by the imposition of reasonable sanctions. The court, however, should not go beyond the necessities of the situation to foreclose the merits of controversies as punishment for general misbehavior. B. F. Goodrich Tire Co. v. Lyster, 5 Cir. 1964, 328 F.2d 411; see 4 J. Moore, Federal Practice § 37.03 (1969)." · 423 F.2d at 860–61

*See also* Bon Air Hotel, Inc. v. Time, Inc., 5 Cir. 1967, 376 F.2d 118, 121, cert. denied, 393 U.S. 815, 89 S.Ct. 225, 21 L.

Ed.2d 179 ("The dismissal of an action with prejudice is a drastic remedy and should be applied only in extreme circumstances").

■ We hold that the trial court erred in dismissing the action as to the 26 plaintiffs. The court made no finding of "willful disobedience," "gross indifference," or "deliberate callousness," and we can find no evidence of such. The record shows that while this action was commenced in 1966 by over 150 plaintiffs, the defendants took no discovery whatsoever until April 7, 1969, less than two months prior to trial. Defendants then submitted to each plaintiff 37 interrogatories and numerous subquestions, including several irrelevant questions which were stricken by the court after the plaintiffs moved for a protective order. Plaintiffs were ordered to answer the remaining interrogatories by May 22, which date was extended 24 hours. The record reveals that counsel made a good faith effort to secure the required answers, but simply ran out of time. Plaintiffs' counsel were able to compile over 300 pages of discovery, but simply were unable to contact all plaintiffs in such a short time, especially since many of plaintiffs had moved from Natchez after the passage of 3 years. Some milder sanction might have been appropriate for failure to answer, *see* Societe Internationale Pour Participations Industrielles et Commerciales, S. A. v. Rogers, *supra*, 357 U.S. at 208, 78 S.Ct. 1087. However, considering the large number of plaintiffs, the length of the interrogatories, and the dilatoriness on the part of defendants, *cf.* B. F. Goodrich Tire Co. v. Lyster, *supra*, we think the drastic remedy applied here was unjustified.

We do not intend that plaintiffs should profit from failure to respond to discovery. Our determinations as to liability, however, would not be affected by the unanswered interrogatories, the information which was sought being largely stipulated or irrelevant to our decision. On remand for a determination of

individual damages, however, the trial court may exercise its discretion to cure any prejudice to defendants. For example, it may take as admitted in accordance with defendants' claims those questions which remain unanswered, Fed. R.Civ.P. 37(b) (2) (A), or, after a reasonable time for compliance has passed, ultimately dismiss the action as to those who are then in willful noncompliance. *See* R. De Bouard & Cie v. S. S. Ionic Coast, S.D.Tex.1969, 46 F.R.D. 1.

Reversed and remanded in part.

BELL, Circuit Judge (concurring specially):

I concur specially to indicate my agreement with the result reached by the majority, and also to record a continuing belief that all police and ancillary personnel in this nation, whether state or federal, should be subject to the same accountability under law for their conduct. In a sense, this is a resurrection of the dissenting opinion of Judge Gewin in Norton v. McShane, 5 Cir., 1964, 332 F.2d 855, 863.

Here we properly hold defendants responsible for cruel and unusual punishment in violation of the Civil Rights Statute, 42 U.S.C.A. § 1983. They were acting under color of state law but in Norton v. McShane, we held the same law inapplicable to federal officers charged with conduct equally reprehensible. We went further and found the federal officers immune from accountability under the common law cause of action. I agreed then with Judge Gewin's strong dissent to the effect that the federal officers should not have been treated with impunity. It is regrettable that we have one law for Athens and another for Rome.

Such a condition is difficult for the average citizen to understand and makes an already complex system of federalism needlessly more complex. In a case involving federal officers, I would terminate this anomaly by seeking to overrule Norton v. McShane to the end of making all police and jailers subject to the same standard of accountability in their treatment of the citizen.

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

Before JOHN R. BROWN, Chief Judge, and TUTTLE, WISDOM, GEWIN, BELL, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, SIMPSON, MORGAN, CLARK, INGRAHAM and RONEY, Circuit Judges.

BY THE COURT:

A member of the Court in active service having requested a poll on the application for rehearing en banc and a majority of the judges in active service having voted in favor of granting a rehearing en banc,

It is ordered that the cause shall be reheard by the Court en banc on briefs without oral argument. The Clerk will specify a briefing schedule for the filing of supplemental briefs.